**HOLIDAY INNS, INC., Plaintiff,**

v.

**800 RESERVATION, INC., Earthwinds Travel, Inc., d/b/a Earthwinds Travel Agency, and Call Management Systems, Inc., Defendants.**

No. 3:93–cv–0512.

United States District Court,
E.D. Tennessee,
at Knoxville.

Nov. 15, 1993.

Thomas A. Bickers, D Michael Swiney, Paine, Swiney & Tarwater, Knoxville, TN, for Holiday Inns Inc.

R. Bradford Brittian, Pitts and Brittian, Knoxville, TN, Hugh Latimer, Danny E. Adams, Rachel J Rothstein, Wiley, Rein & Fielding, Washington, DC, for 800 Reservation Inc.

Herbert S Moncier, Law Office of Herbert S. Moncier, Knoxville, TN, for Earthwinds Travel, Inc. dba Earthwinds Travel Agency.

## MEMORANDUM OPINION

JARVIS, Chief Judge.

This action seeks injunctive relief and compensatory and punitive damages for infringement of service marks and unfair competition under the trademark laws of the United States, 15 U.S.C. §§ 1051, *et seq.*, and under

the trademark laws of Tennessee, Tenn.Code Ann. §§ 47–25–501, *et seq.* Plaintiff also alleges related state claims of interference with prospective business advantage, unjust enrichment, unfair competition, and interference with business relationship. Specifically, this action arises out of defendants' use of a toll-free reservation number which is similar to Holiday Inns' toll-free reservation number. Holiday Inns has utilized the toll-free number 1–800–HOLIDAY, *i.e.,* 1–800–465–4329, for 10 years. On May 30, 1993, defendants purchased the toll-free number 1–800–H[zero]LIDAY, *i.e.,* 1–800–405–4329. Holiday Inns alleges that defendants purchased its number "in a blatant attempt to expand its reservation business by intercepting calls the traveling public intends for [Holiday Inns]." [*See* Doc. 3, p. 1].

This matter came before the court on October 12, 1993 on plaintiff's motion for a preliminary injunction. After consideration of the pleadings, the testimony of the witnesses and the exhibits introduced at the hearing, the parties' briefs, the arguments of counsel, and the applicable law, the court converted the temporary restraining order [Doc. 7], as extended by agreement of the parties [*see* Doc. 11], into a preliminary injunction [*see* Doc. 33]. This opinion shall serve to clarify the court's reasons for the issuance of the preliminary injunction. *See* Rule 65(d), Federal Rules of Civil Procedure; *see also* Rule 52(a), Federal Rules of Civil Procedure.

## I.

Most of the facts of this case of first impression are undisputed. Since 1952, Holiday Inns has been in the business of operating, in its own name and through license agreements, a world-wide network of hotels utilizing the name "Holiday Inn" and associated trade and service marks. In conducting this business, Holiday Inns owns, operates and licenses a system of operation designed to provide distinctive, high quality products and services to the public under its trade name. Holiday Inns' products and services have been extensively advertised and offered throughout the United States and have earned enormous commercial success and favorable recognition and acceptance among consumers. In connection with these activities, Holiday Inns has registered hundreds, if not thousands, of marks around the world. A few of these are as follows:

| Registration No. | Mark | Services |
| --- | --- | --- |
| 592539 | Holiday Inn | Hotel and restaurant services |
| 1555275 | Holiday Inn Crowne Plaza | Hotel and restaurant services |
| 812308 | Holidex | Reservations services |
| 1064668 | Holidome | Health club |

As an important component of its marketing effort, and in order to make it more convenient for the traveling public to reserve rooms at Holiday Inns throughout the world, Holiday Inns has utilized a toll free 1–800 number since 1983.[1] In order to enhance the usefulness of a 1–800 number, businesses often obtain vanity or mnemonic 800 numbers. These numbers use the letters on the telephone key pad to spell an easily remembered word corresponding to their 800 telephone number. Thus, Holiday Inns utilizes 1–800–HOLIDAY or 1–800–465–4329. As with its other marketing enterprises, Holiday Inns has invested a great deal of time, money and effort to increase the traveling public's

---

1. "800 Service" is widely recognized as a specialized long-distance offering which enables a subscriber to receive calls from any geographic location without charge to the party originating the call. Businesses employ 800 Service to enable the public to reach them without incurring a long distance charge. 800 Service has therefore become an essential marketing tool for businesses seeking to enable the public to make advance reservations, such as airlines, hotels, and car rental agencies.

awareness of its 1–800–HOLIDAY phone number.

This litigation has its genesis in a change for the 800 Service which occurred on May 1, 1993 at the direction of the Federal Communications Commission ("FCC"). Until that date, local telephone company equipment was capable of directing or routing 800 calls based only on the first three digits following the 800 prefix. Thus, with regard to the telephone number at issue, all calls to 1–800–465–0001 through 9999 had to be sent to the same long distance company by the local telephone companies. The long distance carrier's equipment then sent the call to the proper recipient by reading the last four digits. As a result of this system, 800 service numbers had to be assigned to long distance carriers in blocks of 10,000.

This telephone company routing technique obviously made users of 800 Service vanity numbers captive customers of the long distance company assigned to their specific number. If the 1–800–465–xxxx series was assigned to AT & T, for example, a business using a vanity number in that series could not switch to MCI without relinquishing its number. Recognizing that this system limited customer choice and impaired competition, the FCC directed that it be revised. Thus, beginning May 1, 1993, a new local telephone company system was implemented for 800 Service. Under this new plan, local telephone companies are now able to route 800 number calls based on all seven digits of the number following 800, rather than just the first three digits. This new system makes 800 numbers "portable" allowing users of vanity numbers to switch long distance carriers without losing their special 800 number.

With this change came the opportunity to purchase 800 Service numbers which had been previously unavailable. Of particular significance to this litigation was the opportunity to purchase a "complementary" number for 1–800–HOLIDAY which, in this case, is 1–800–H(zero)LIDAY. A complementary number is a euphemism for a misdialed number—except it is a misdialed number which can be easily predicted. It is well known in the telecommunications field that vanity 800 numbers are often misdialed. In fact, a report in the New York Times[2] over a year ago described this phenomena and the experience one company (U.S. Sprint) encountered with callers confusing the "O" in a word with "0" (zero) on the telephone key pad:

> But word play numbers are giving consumers and some businesses fits. It is not uncommon to spend minutes fumbling across a dial pad to spell out a seven-letter word. Even the Sprint Corporation, which like all long distance carriers arranges special numbers for other businesses, has found that consumers who try to dial its toll-free number, (800) PINDROP, sometimes have problems getting through.
>
> 'People often confuse the letter "O" and zero when they dial,' said Richard Goulet, a director of business-product marketing for Sprint. For that reason, the company has taken out two telephone numbers: one in which the letter "O" in PINDROP is the "6" on the dial or key pad; the other in which it is the zero.

Because of this phenomena, some long distance carriers encourage their clients to subscribe to both the vanity and complementary numbers. Many companies, including hotel chains like Marriott and Red Roof Inns, have done so. Others, like Holiday Inns, have not. In the event that these complementary numbers are not assigned or are not in active use, callers who reach them will receive a busy signal or a recorded message indicating the number is out of service. Obviously, if the complementary number is assigned to another user and is active, then callers will reach that entity.

Defendant Call Management Systems, Inc. ("CMS"), a Tennessee corporation, is the customer of record for Holiday Inns' complementary number, 1–800–H(zero)LIDAY. Albert H. Montreuil owns 50% of the stock of CMS and Blake Bookstaff owns the other 50%. CMS has been in business for approximately two and a half years and operates as a "service bureau." Mr. Montreuil describes a service bureau as "an organization that assists customers in obtaining and providing

**2.** Barry Meier, "For a Special Number, Dial (800) VANITY," *New York Times*, July 11, 1992, ¶ 1, at p. 46.

various telecommunications services." [*See* Doc. 21, Attachment B, ¶ 7]. CMS's advanced telecommunications equipment enables it to maximize the benefits of using 800 Service. For example, CMS has the capability to electronically answer as many as 212 simultaneous calls for its customers. Without such equipment, most callers would get a busy signal [*see id.*].

CMS's sophisticated computerized telecommunications system can receive calls made from across the country on an 800 number through a central answering system which can prescreen calls and then provide automated menu options and information to callers. Furthermore, the system can recognize when a live operator is necessary and will transfer the call to a location designated by the customer for connection to that live operator. CMS currently provides these telecommunications services for the State of Tennessee, the Gatlinburg Chamber of Commerce, the Pigeon Forge Department of Tourism, Dollywood, and many other Gatlinburg area businesses. As a result, the CMS system answers about 6,000 calls per day [*see id.*, ¶ 8].

Mr. Montreuil became aware of the complementary number concept based on his experiences with CMS and, in particular, CMS's experiences with its own telephone numbers. By contract, CMS answers calls for Dollywood, an amusement theme park located in Pigeon Forge, Tennessee. It is owned in part by Dolly Parton, a popular country singer. The park's telephone number is 1–800–365–5996, *i.e.*, 1–800–DOLLYWOOD.[3] Despite an adequate amount of equipment dedicated to answering the park's lines, many consumers complained that they were unable to contact an operator when dialing the telephone number. When Mr. Montreuil investigated this problem, he discovered no technical difficulties with CMS's equipment. Instead, Mr. Montreuil discovered that consumers were mistaking the letter "O" in Dollywood for the number "Zero". These customers were therefore dialing "Zero" rather than the number 6. CMS subsequently secured most of the complementary telephone numbers for 1–800–365–5996 to insure that its customer obtained the most value from its 800 Service [*see id.*, ¶ 18].

Based upon this and other similar experiences with 800 Service numbers, Mr. Montreuil determined that large volume users of 800 Service who choose not to answer their own complementary numbers might be interested in paying a service bureau to do so. As part of this endeavor, Mr. Montreuil purchased Holiday Inns' complementary number, 1–800–H(zero)LIDAY in early May 1993. On June 15, 1993, CMS entered into a verbal agreement with defendant Earthwinds Travel, Inc., d/b/a Earthwinds Travel Agency ("Earthwinds"). Earthwinds agreed to terminate and process calls from consumers on 1–800–405–4329 in return for 10% of all commissions received for placing hotel bookings. The parties further agreed that Earthwinds would answer calls on this 800 Service until defendant 800 Reservations, Inc. ("800 Reservations"), was in a position to do so.

Mr. Montreuil incorporated 800 Reservations on June 30, 1993.[4] Generally, 800 Reservations was formed as a travel agency to provide services to callers to hotel 800 complementary numbers.[5] Not only would 800 Reservations assist callers in reaching their preferred hotel chain, but it would also aid the hotel chain in capturing otherwise lost customers. Of course, Mr. Montreuil expected to establish a unique and profitable travel agency business in the process.

On August 18, 1993, CMS terminated its arrangement with Earthwinds. The telephone number 1–800–405–4329 was not operational from August 18 to August 20, 1993, when it was reactivated for use by 800 Reservations.

---

3. The eighth and ninth digits—the last O and D in Dollywood—are, of course, not recognized by the telephone network and are simply omitted by the caller.

4. Messrs Montreuil and Bookstaff each own 42% of the stock; Thomas M. Grubbs owns 16% of the stock. [*See* Doc. 21, Ex. B, ¶ 3]. Mr. Grubbs is the principal operator of Earthwinds Travel.

5. During the preliminary injunction hearing, Mr. Montreuil testified that he had also purchased the other complementary number for 1–800–HOLIDAY which is 1–800–HOL(one)DAY. In addition to Holiday Inns, 800 Reservations has purchased complementary numbers for the vanity numbers of the following hotel chains: Hampton Inns, Howard Johnson, Stouffers Hotels, Loews Hotels, Sheraton, Compri Hotels, Savoy Hotels, Peabody Hotels and Days Inns.

At the hearing on October 12, 1993, other evidence was introduced which has a bearing on the court's analysis. Janet Poley, the Director of Travel Delivery Systems for Holiday Inns, testified that there are five major computerized reservations systems ("CRS") which she described as "one stop shopping." One of these, System 1, is used by defendants. Only eight room types and rates are available to defendants on this system. Furthermore, the rates are only updated every 30 days on System 1. In contrast, Holiday Inns' CRS, Holidex, can maintain 12 room types and rates. Moreover, the rates are updated daily on Holidex. The significance of this is two-fold. First, it is possible for a customer who reaches 800 Reservations through Holiday Inns' complementary number to be advised that a particular Holiday Inn in Atlanta, for example, has no vacancies (because System 1 reflects that information) when, in fact, rooms are available in that hotel. Moreover, the customer would have been made aware of these vacancies had he been able to contact Holiday Inns directly through its vanity number. Second, it is more likely that a customer will obtain a better room rate by contacting Holiday Inns directly through its vanity number as opposed to contacting 800 Reservations through Holiday Inns' complementary number. In fact, Ann Fant, the Manager of Travel Agent Commissions Services for Holiday Inns, testified that the average daily rate for booking through a travel agency, such as 800 Reservations, is $63.37, as opposed to $57.19 for those reserving rooms through 1–800–HOLIDAY.

The testimony at the hearing also indicated that the commissions paid by Holiday Inns to Earthwinds is as follows:

| Month | Commission Payment |
| --- | --- |
| September, 1992 | $29.95 |
| October, 1992 | Zero |
| November, 1992 | $11.02 |
| December, 1992 | Zero |
| January, 1993 | $10.70 |
| February, 1993 | $25.35 |
| March, 1993 | $ 6.60 |
| April, 1993 | $47.30 |
| May, 1993 | Zero |
| June, 1993 | $1,144.96 |
| July, 1993 | $5,211.42[6] |

[See Doc. 1, Ex. 2]. Furthermore, Ms. Fant also testified that Holiday Inns had paid $8,888.71 in August, 1993, and that this represented approximately $275,000 worth of room reservations. The present arrangement is therefore not only profitable to defendants, it is also extremely profitable to Holiday Inns. There is certainly credible evidence to suggest that if a customer has misdialed Holiday Inns' toll-free number by dialing its complementary number, only to receive a busy signal, and if that customer persists in receiving a busy signal by continuing to dial the complementary number, then that potential customer for Holiday Inns will eventually contact another hotel chain with a suitable facility in that same city. Based on this evidence, defendants suggest that the issuance of a preliminary injunction not only harms them but also harms Holiday Inns.

Mr. Montreuil also testified during the hearing. Mr. Montreuil candidly admitted that his business was derived primarily from misdialed vanity numbers. Mr. Montreuil also admitted that the more frequently Holiday Inns advertised its vanity number, then the more business he would receive. Mr. Montreuil's intent is clear. He intends to create a profitable business for himself and his employees; he intends to increase profits for Holiday Inns (and other hotels for which he has purchased the complementary numbers); and he intends to provide a unique service to the public.

Most, if not all, of the above facts are undisputed. The principal issue in dispute at the hearing was whether a customer who had dialed Holiday Inns' complementary number would always receive defendants' recorded message or whether the recorded message could be by-passed. If so, then the customer could initially be under the impression that he was speaking with one of Holiday Inns' employees when, in fact, he was speaking directly with one of 800 Reservations' employees. Plaintiff offered the deposition of Douglas E. Slenk [see Doc. 27] and the affidavit of Thomas Miller [see Doc. 1, Attach-

---

**6.** According to Mr. Montreuil's deposition testimony, the amount owed to 800 Reservations from Holiday Inns for July 1993 is even higher—"more than half" of $27,000 [see Doc. 23, p. 24].

ment 4] as well as his deposition [*see* Doc. 27] in support of its position that defendants' system was faulty. Defendants presented testimony at the hearing to indicate that its system was infallible. The court need not resolve this factual dispute for purposes of the pending motion because the court will assume that the following message is always received by the customer dialing Holiday Inns' complementary number:

> Hello. You have misdialed and have not reached Holiday Inns or any of its affiliates. You have called 800 Reservations, America's fastest growing independent computerized hotel reservations service. One of our highly trained hotel reservations specialists will be with you momentarily to provide the Holiday Inns number or to assist you in finding the lowest rate at over 19,000 properties worldwide, including such hotel chains as Holiday Inns, Guest Quarters, Hampton Inn, Sheraton, Comfort Inn, and many more. If you are a member of a hotel's frequent guest program, have that number ready. Please stay on the line, assistance is just a moment away.

[*See* Doc. 21, Attachment A, ¶ 31].

The court notes that the recorded message is somewhat misleading because 800 Reservations describes itself as a reservations service—not a travel agency. This distinction is significant because travel agencies do not have access to the lowest rates available because they charge commissions. However, if a consumer believes he is dealing with a reservations service, he may also reasonably believe that it is affiliated with the hotel so that a lower rate can be obtained. Nevertheless, for the reasons set forth below, the substitution of the phrase "travel agency" for "reservations service" in the recording would not change the court's opinion with respect to issuing the preliminary injunction.

## II.

Holiday Inns alleges that defendants violated two sections of the Lanham Act, § 32, 15 U.S.C. § 1114 (trademark infringement), and § 43, 15 U.S.C. § 1125 (unfair competition). Section 32(1)(a) provides in pertinent part:

> Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... or advertising of any goods or services on or in connection with which such use is *likely to cause confusion,* or to cause mistake, or to deceive
>
> . . . . .
>
> shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a) (emphasis added). Section 43(a) provides in pertinent part:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). While unfair competition is a broad field within which lies the concept of trademark infringement, the standard for relief is substantially identical—likelihood of confusion. *Wynn Oil Co. v. Thomas,* 669 F.Supp. 831, 834 (M.D.Tenn. 1986), *rev'd in part and aff'd in part,* 839 F.2d 1183 (6th Cir.1988). Therefore, the alleged violations of trademark infringement and unfair competition will be jointly addressed.

 Holiday Inns is entitled to a preliminary injunction if it can show: (A) irreparable harm and (B) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981)).

Accord, Versar, Inc. v. Vertac Chem. Corp., 573 F.Supp. 844, 846 (W.D.Tenn.1983). In the context of a Lanham Act claim, both prongs of this test can be established by a single fact. Specifically, "a showing of likelihood of confusion as to source or sponsorship establishes a requisite likelihood of success on the merits as well as risk of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982) (citing *American Home Products v. Johnson Chem. Co.,* 589 F.2d 103, 106 (2d Cir.1978)). *Accord, Frisch's Restaurants, Inc.,* 670 F.2d at 647 (The standard of proof needed to prevail in a § 43(a) action for injunctive relief is a showing of "likelihood of confusion.").

■ In *Frisch's,* the Sixth Circuit adopted an eight factor test for determining whether there is likelihood of confusion: (1) the strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the mark; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. 670 F.2d at 648. However, as the Sixth Circuit recently observed in *Wynn Oil Co.,* 839 F.2d 1183 (6th Cir.1988):

> These factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.

839 F.2d at 1186.

■ The factor of defendant's intent, however, is critical, " 'since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], *that fact alone may be sufficient to justify the inference that there is confusing similarity.*' " *Frisch's Restaurants,* 670 F.2d at 648 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703–04 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)) (emphasis in original). The rationale for this inference is set forth in *Little Caesar Enter-prises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568 (6th Cir.1987):

> [A] defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks that there is at least a possibility that he can divert some business from the senior user—and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact.

*Id.* at 572. Furthermore, direct testimony is not necessary to establish wrongful intent; it can be inferred from defendant's acts. *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983).

■ The instant case is somewhat unusual because there is direct testimony to establish defendants' intent. Mr. Montreuil testified without reservation that he purchased Holiday Inns' complementary number because he intends to derive benefit from Holiday Inns' reputation (as well as the reputation of other hotel chains for which he has purchased complementary numbers). At first blush, this statement in and of itself would appear to be a fatal concession because "that fact alone be sufficient to justify the inference that there is confusing similarity." *Frisch's Restaurants,* 670 F.2d at 648 (citation and emphasis omitted). Nevertheless, defendants attempt to escape the legal consequences of this admission by pointing out that they are first required to be using plaintiff's mark or logo. If they have not done so, then the court need not reach the issue of likelihood of confusion.

The court agrees with defendants that, in a traditional sense, they have made no use of a Holiday Inns' registered mark or of any similar name or logo. That is, they are not holding themselves out as an entity under the Holiday Inns' umbrella. Moreover, defendants are not advertising a similar word or name to induce public confusion and cause consumers to reach the wrong party. *Cf. Dial–A–Mattress Franchise Corp. v. Page,* 880 F.2d 675 (2d Cir.1989) (Defendant was enjoined from promoting a similar vanity number); *Murrin v. Midco Communications, Inc.,* 726 F.Supp. 1195 (D.Minn.1989) (Plaintiff registered "Dial L–A–W–Y–E–R–S" as a service mark; court only enjoined

defendant from using the similar vanity number while it continued to advertise that number); and *American Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corporation,* 622 F.Supp. 673 (D.C.Ill.1985) (Court stated that the wrongful conduct was not the use of the telephone number but instead the misleading advertisement of the similar vanity number in the airline company's yellow pages listing). In fact, defendants engage in no meaningful advertising whatsoever.[7]

Nevertheless, the court concludes that the defendants are not only using plaintiff's mark in violation of the Lanham Act, but also that they are doing so in a most insidious and parasitic manner. From the consumer's standpoint, defendants' use is insidious because, while defendants have not created the confusion inherent in the use of vanity numbers, they have cleverly spread their net to capture the consumer at the very moment his confusion is manifested but not necessarily apparent. Although the defendants' recorded message initially advises the consumer that he has misdialed and has not reached Holiday Inns or any of its affiliates, the consumer is then immediately offered more options than he had originally thought possible. In other words, the consumer is no longer restricted to a reservation in Holiday Inns' rooms; he can also, without expending additional time to dial another number, receive immediate assistance to locate a room in another hotel chain, if necessary. At this point, the consumer's expectations appear not only to have been met but even to have been surpassed. To paraphrase Mr. Grubbs, the defendants' mission of "taking these lost souls and showing them the way to their door," [*see* Doc. 24, p. 15], seems to have been fulfilled.

However, a closer examination of the proof indicates otherwise. It indicates that the consumer does not always reach his desired destination nor does he reach it for the same price. In particular, the evidence establishes that defendants do not have access to the same number of room types which would be available to a consumer through Holiday Inns' vanity number. Thus, a consumer may receive a room which does not fulfill his initial expectations because of this limitation in defendants' CRS. Moreover, the evidence establishes that a consumer will pay several dollars more for a room reserved by defendants through the complementary number than he would pay had he dialed Holiday Inns' vanity number. Finally, the evidence establishes that a consumer could be advised by one of defendants' employees that there is no Holiday Inns' room available in a particular city when a call to Holiday Inns' vanity number would indicate otherwise. This scenario could also result in the consumer paying more to stay in a competitor's hotel.

From Holiday Inns' standpoint, defendants' use of this complementary number is parasitic. The defendants derive benefit *solely* from Holiday Inns' reputation. In fact, defendants have no independent reputation. The consumer is not even aware of defendants' existence until after he has misdialed Holiday Inns' vanity number. If not for Holiday Inns spending millions of dollars on advertising each year, defendants would have no service whatsoever to provide to the consumer. For the defendants to be able to reap profits based solely on the advertising efforts and expenditures of others seems to be a clear violation of the spirit, if not the letter, of the Lanham Act. While the court agrees with defendants that Holiday Inns is losing business as a result of its inexplicable failure to purchase its complementary number, plaintiff's failure to do so does not provide defendants a basis to circumvent the clear mandate of the Lanham Act. Defendants' use of plaintiff's mark involves more than the likelihood of confusion—our present technology allows defendants to use plaintiff's mark in such a way that they can anticipate actual confusion with absolute accuracy and can profit accordingly. Defendants' nefarious use of plaintiff's mark must therefore be enjoined as it constitutes both trademark infringement and unfair competition.

---

7. The paucity of defendants' advertising is reflected in Exhibit 3 to Mr. Montreuil's deposition

[*see* Doc. 23].

An appropriate preliminary injunction has already been issued.