McDONALD'S CORPORATION, Plaintiff,

v.

SHOP AT HOME, INC., Sports Collectibles, Inc. and Gary Fillers, Defendants.

No. 3:99–0438.

United States District Court, M.D. Tennessee, Nashville Division.

Feb. 2, 2000.

---

Robert S. Patterson, Julie C. Murphy, Boult, Cummings, Conners & Berry, Nashville, TN, Jeff Lieberman, Robert Eliot Shapiro, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, Chicago, IL, for McDonald's Corporation, plaintiff.

Barbara Jean Moss, Nancy A. Vincent, Wyatt, Tarrant & Combs, Nashville, TN, George J. Phillips, Antioch, TN, for Shop at Home, Inc., defendant.

Randall Chadwell Ferguson, Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, Harold L. North, Jr., Stanley W. Hildebrand, Shumacker & Thompson, Chattanooga, TN, for Sports Collectibles, Inc., Gary Fillers, defendants.

Randall Chadwell Ferguson, Harold L. North, Jr., Stanley W. Hildebrand, (See above), for Classic Collectibles, Inc., defendant.

## *MEMORANDUM*

TRAUGER, District Judge.

Sports Collectibles, Inc., Classic Collectibles, LLC., and Gary Fillers purchased a large number of Teenie Beanie Baby toys offered in McDonald's 1999 marketing campaign prior to the toys' release date. The Shop At Home television network then offered those toys for sale, giving consumers an opportunity to get the toy while bypassing the "drive through," or avoiding buying a McDonald's Happy Meal. McDonald's has sought and obtained a preliminary injunction from this court and now seeks damages under state and federal laws. Sports Collectibles, Classic Collectibles and Gary Fillers have filed a Motion for Partial Summary Judgment (Docket No. 58) and the Shop At Home television network has filed a Motion for Summary Judgment (Docket No. 61). The court heard oral argument on these motions on December 20, 1999.

McDonald's seeks recovery from all defendants under 15 U.S.C. § 1125 for unfair competition that damaged the company's goodwill; 15 U.S.C. § 1114 for trademark infringement; the Tennessee Consumer Protection Act for deceptive trade practices that are intended to confuse the public; and Tennessee common law governing unfair competition. The plaintiff also seeks to recover from Sports Collectibles, Classic Collectibles and Gary Fillers for tortious procurement of breach of contract under Tennessee statutory and common law.

All defendants have moved for summary judgment on the state and federal trademark and unfair competition counts of the Complaint. The defendants assert that they are entitled to judgment as a matter of law because the undisputed facts show that they merely re-sold genuine, unaltered McDonald's toys, which does not violate any federal or state trademark or unfair competition laws and is protected by the "first sale doctrine." McDonald's asserts that summary judgment should be denied because the first sale doctrine is inapplicable in this case and because there is a disputed issue of material fact over whether the defendants misused McDonald's trademark.

### *I. Factual Background*

In May 1999, McDonald's ran a marketing campaign that offered a "Teenie Beanie Baby" toy with the purchase of a Happy Meal. The toys were miniature versions of the wildly popular Ty Beanie Baby, and had been a very successful marketing tool for McDonald's in 1997 and 1998. McDonald's corporation receives monthly

payments based upon a percentage of the gross sales from its franchisees, and the toys had brought about a dramatic increase in these sales at the individual restaurants.

The 1999 toy promotion was to release twelve new toys, four each week throughout May, with the final four figures to be released on May 28. (Docket No. 78, Ex. 3, para. 7) It had entered a license agreement with Ty to supply the toys through what McDonald's refers to as its "supply chain." (Docket No. 84, para. 13) Everything from food products to napkins to the 1999 Teenie Beanie Babies are supplied to the franchisees through this supply chain. (Docket No. 80, para. 5) Simon Marketing ("Simon"), The Marketing Store Worldwide ("TMSW"), Perseco Systems Services L.P. ("Perseco") and Hub 1 Logistics are the various companies within the supply chain. (Id. at para. 4) All of these companies in the supply chain act on behalf of McDonald's, but are independent entities, separate from McDonald's corporate empire. (Id. at para. 5)

Simon and TMSW contracted with Ty-approved factories located in China to manufacture the 1999 Teenie Beanie Babies on behalf of McDonald's Corp and its licensees. (Id. at para. 8) The toys were individually sealed in plastic bags that carried the statement, "Licensed for distribution only by McDonald's restaurants with food purchase. NOT FOR RESALE." (Docket No. 84, para. 17) The toys were packed in boxes and sealed with a licensing agreement called the shrink wrap agreement attached to the outside. (Docket No. 80, para 8) Simon and TMSW paid the Chinese manufacturers for the toys and the two companies took title to the toys. (Id. at paras. 8–9)

Perseco took possession of the toys when they cleared customs. (Id. at para. 10) Perseco shipped the toys to one of four hub warehouses owned by Hub 1 Logistics. (Id. at para. 11) Perseco paid Hub 1 Logistics a fee for storing the toys until Perseco shipped the toys to one of 41 distribution centers around the country.

(Id.) The distribution centers paid Perseco for the toys and title passed to the distribution centers. (Id. at paras. 12–13) The distribution centers sent the toys to the individual restaurants. (Id.) Throughout this chain, although McDonald's gave permission for the use of its trademarks, it held neither possession nor title to the toys.

The shrink wrap agreement affixed to the boxes of toys stated that when the franchisees accepted the toy shipments, they were indicating that they agreed to the terms of the shrink wrap agreement. (Docket No. 62, Ex. C) According to the shrink wrap agreement the toys were to be distributed only with food purchases and none of the toys were to be released before their scheduled release date unless the restaurant ran out of the earlier-released figures. (Id.) The agreement prohibited selling more than ten toys with any single food purchase and prohibited selling an entire set of all twelve figures in a single transaction. (Id.) "Title to the intellectual property associated with the Toys is not transferred to you through this License and remains the property of either Ty or McDonald's as applicable," it states. (Id.) It also states:

> This License Agreement becomes effective upon your acceptance of the Toys. You may choose not to enter into this License Agreement by returning for credit all Toys delivered to you. This License Agreement will automatically terminate if you, your employees or agents fail to comply with the Condition of Participation. Upon termination for failure to comply, your supply of Toys for the Promotion will be suspended and if there is a Teenie Beanie Baby promotion in the year 2000, your supply of Toys for that promotion will be limited to one case. Additionally, Ty has agreed to buy back a portion of any undistributed Toys.

(Docket No. 62, Ex. C) After the franchisees accepted delivery of the toys, the distribution centers sent invoices of about

57 cents per toy to the restaurants, which they were required to pay in 21 days. (Docket No. 80, para. 15)

As the toys make their way through the distribution chain, McDonald's neither pays nor receives any money in any of the transactions. (*Id.* at para. 16) At no point does McDonald's take title to the toys or any of the products that move through the distribution chain. (Docket No. 72, para. 10) McDonald's stated during oral argument that the distribution network runs on oral agreements between the independent companies.

McDonald's acts as franchisor and owner of all intellectual property associated with the restaurants, which are operated as independent businesses by the franchisees. (Docket No. 79, para. 3) The franchisees are allowed to use the McDonald's trademarks under the terms of their franchise agreements, under which they agree to pay McDonald's Corp. a percentage of their gross sales every month. (Docket No. 79, paras. 4–5) By selling the toys "out the back door" instead of to customers with food purchases, franchisees are depriving McDonald's of the profit from the trademarked toy. (Docket No. 79, para. 5) Such sales violate the shrink wrap agreement and the franchise agreement. (Docket No. 79, paras. 6, 10–11) If a franchisee breaches the franchise agreement, McDonald's Corp. has the right to terminate the franchise, thus prohibiting the franchisee from using the McDonald's trademark. (Docket No. 79, para. 6) By violating the shrink wrap agreement, the franchisee runs the risk of being denied access to future Teenie Beanie Baby promotions. (Docket No. 79, para. 10)

Defendant Gary Fillers apparently began purchasing the toys before they were available to the general public and offered them to the Shop At Home network for sale. (Docket No. 23, para. 27) Mr. Fillers used relatives to buy as many toys as they could obtain from the restaurants. (Docket No. 39 at 209–214) In so doing, the relatives made purchases that violated not only the shrink wrap agreement, but

also the Franchise Agreement between the franchisees and McDonald's, according to McDonald's. (Docket No. 80, Ex. 6 at 103–110) There were purchases of entire sets, of more than ten toys with a single food purchase and some that were made with no food at all, McDonald's asserts. (*Id.*) Because McDonald's only made money on the promotion through increased food sales, the corporation did not make any money on the sales that violated the agreements. Mr. Fillers provided about 100 sets of the toys to Shop At Home, which distributed them before the authorized release date. (*Id.* at 151–52)

Shop At Home began advertising the Teenie Beanie Babies before McDonald's started its own advertising promoting its sale of the toys. (Docket No. 84, para. 29) McDonald's asserts that the advertisements violated an agreement the two companies had reached after a similar incident in 1997. According to a letter dated August 4, 1997, from Pamela A. Kilby of McDonald's to Kevin Hite of Shop At Home, the television station had agreed to include a disclaimer stating that the network had purchased Teenie Beanie Babies from consumers who bought them as part of the McDonald's promotion. (Docket No. 79, Ex. C) The letter also stated that Ms. Kilby was concerned about several "inappropriate statements" made on the sales program. (Docket No. 79, Ex. C) Specifically, the host selling Beanie Babies allegedly said that McDonald's customers were buying Happy Meals to obtain the toys and discarding the food. They also noted that the tags on the toys could be a choking hazard for small children. (*Id.*)

Shop At Home asserts that, since it received the letter from McDonald's, it has run a "crawl" with the Teenie Beanie Baby sales program stating that the toys were purchased from a "secondary" source. This is confirmed in a letter from McDonald's counsel Robert E. Shapiro to George Phillips, vice president of Shop At Home. That letter states, "the broadcasts state in writing that the toys have been

acquired in the secondary market." (Docket No. 80, Ex. 14) In a tape of one broadcast the "crawl" stated, "Shop at Home is not an authorized Ty Incorporated dealer. All Beanie Baby plush toys are purchased from secondary market sources. Due to the Beanie Baby market volatility, Shop at Home's return policy on all Beanie Babies will be 10 days after you return your merchandise." (Docket No. 23, Attach.) Despite the information furnished in the crawl, some individuals called McDonald's to inquire about why McDonald's was providing an inventory for the Shop At Home network.[1]

The crawl appears almost continuously throughout the approximately eight minutes of tape. (*Id.*) During that time, the phone number to call to order the toys and the words " '99 McDonald's Teenie Beanie Set" and "Will Ship 5-25-99" appear on the screen alongside the twelve Teenie Beanie Babies. The toys were selling for $299.95 for "all Teenie Beanies ever made," or $89.95 for the 1999 set of twelve toys. (*Id.*) The announcer states, "I don't know how the time goes, but May 21st to June 3rd is how long? Two weeks? Two weeks, folks, of absolute frenzy. Only two weeks. That is not a lot of time to get twelve Beanies. And you know how it gets. It just gets crazy, it gets wild." (*Id.*)[2]

As of May 31, 1999, Shop At Home was filling about 6,400 orders for sets of the toys.

1. One portion of a voicemail submitted by McDonald's indicates that the individual was confused, but not that the person was hostile or had any less goodwill toward McDonald's.
 I wondered why this morning on the Home Shopping Club .... they already have the ... it says the 1999 McDonald's Teenie Beanie Babies sets and they showed every one of them and they were saying they got them from McDonald's and they're not shipping them until like the 25th but they showed all of them and everything and kind of wondered why your corporate people would decide to do that instead of letting the people go in and have the fun of look-

## II. Analysis

### A. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). In determining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir.1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that

ing, you know, at them as they come out and do that. I just wondered, you know, why they would make the decision to do that and if you even knew that they had done that. . . .
(Docket No. 80, Ex. 13)

2. A transcript of the toy sale show indicates that the hosts refrained from making statements about consumers throwing away McDonald's food or questioning the safety of the toy tags. (Docket No. 80, Ex. 10) However, the host does state that consumers can avoid going to McDonald's by purchasing the toys from Shop At Home. (*Id.*)

makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 261, 106 S.Ct. 2505.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–252, 106 S.Ct. 2505.

## B. Unfair Competition and Trademark Infringement Under Lanham Act

The Lanham Act is designed to prevent the deceptive use of trademarks to confuse consumers, thereby protecting consumer goodwill toward the trademark owner's business and the ability of consumers to make informed choices among competing products. 15 U.S.C. § 1114[3]; 15 U.S.C. § 1125[4]; *Park N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985); *Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 625–26 (6th Cir. 1996) (holding that there could be no Lanham Act violation unless the defendants used a mark to create confusion); *Advanced Resources Int'l, Inc. v. Tri–Star Petroleum Co.,* 4 F.3d 327, 333 (4th Cir. 1993); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 592 (5th Cir.1993) ("As with trademark infringement, the touchstone of a § 1125 unfair competition claim is whether the defendants' actions are 'likely to cause confusion.' ") The owner of the trademark may assert that a potential tortfeasor has created the likelihood of confusion by leading consumers to believe that they are authorized distributors of a trademarked product when they are not, by "passing

3. Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. . . .

15 U.S.C. § 1114(1)

4. Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in civil action by any person who believes that he or she is or is likely to be damaged by such act.

off" an inferior product as a trademarked product or by otherwise trying to capture business by using another company's trademark in a misleading fashion. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1118–23 (6th Cir.1996); *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 913–16 (Fed.Cir.1984); *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 557–61 (1st Cir.1982).

■ According to the RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1985), a defendant has infringed on a trademark when he uses a mark that causes a likelihood of confusion that (1) the defendant is associated with the trademark owner; (2) the defendant's goods or services are produced, sponsored or approved by the trademark owner; or (3) the goods or services marketed by the trademark owner are sponsored, certified or approved by the defendant. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 20.

### 1. Likelihood of confusion

McDonald's asserts that in this case the defendants created confusion when Shop At Home presented itself as a legitimate, McDonald's authorized outlet for Teenie Beanie Babies.[5] This misrepresentation, McDonald's asserts, created actual confusion among consumers, who were angered that the company was selling the Teenie Beanie Babies to Shop At Home prior to the promotion. This, in turn, damaged the goodwill McDonald's had generated for its trademark.

In *Champions,* the Sixth Circuit reversed a district court ruling that had concluded that four incidents in which individuals confused the Champions Golf Club of Kentucky and the Champions Golf Club of Texas were "weak and unpersuasive" evidence of the likelihood of future confusion. *Champions,* 78 F.3d at 1119. The district

court had discounted the evidence of confusion because the people who had mixed up the two golf courses were merely third parties, not customers of either of the clubs. The Sixth Circuit stated that evidence of actual confusion—even when the confusion was among individuals who are not actual consumers—is "undoubtedly the best evidence of a likelihood of future confusion." *Id.* at 1119 (quoting *Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 601 (6th Cir.1991)). The court stated, however, that confusion was only one factor to consider. *Id.* In fact, the Sixth Circuit remanded *Champions* to the district court with instructions to reconsider the actual confusion as a factor—whether it was by consumers or not—but to keep in mind that "minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion." *Id.* at 1120.

■ Similarly, in *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275 (6th Cir.1997), the court quoted *Wynn,* noting that actual confusion is evidence of likelihood of confusion but cautioning that isolated instances of confusion are not dispositive on the issue. *Daddy's Junky Music Stores,* 109 F.3d at 284. While proof of actual confusion is helpful in the court's analysis of whether there is a likelihood of confusion, the plaintiff need not prove that actual confusion existed to show such a likelihood. *Id.* "Bearing in mind that a successful Lanham Act plaintiff only must show a sufficient potential of confusion, not actual confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent." *Id.*

■ Evidence of actual confusion may be dismissed as *de minimus* if it is of limited scope. "Evidence of the number of instances of actual confusion must be

---

5. The court may consider eight factors to determine whether there is a likelihood of confusion, such as the similarity of the marks and the likely degree of purchaser care and sophistication. The only one of these factors

that either party considers is actual confusion, presumably because the types of allegations in this Complaint are unlike most trademark and unfair competition allegations and many of the factors are, therefore, irrelevant.

placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:14 at 23–43 (4th ed.1999).

Another factor for the court to consider is whether the defendant intended to confuse or mislead consumers. In *Holiday Inns*, the Sixth Circuit found that a retailer who deliberately chose an 800 number so that it could take advantage of the callers who may misdial 1–800–HOLIDAY [6] did not engage in unfair competition or infringe upon Holiday Inns' trademark. The district court had found that the defendant's "parasitic" behavior was barred by the Lanham Act, stating:

> The defendants derive benefit solely from Holiday Inns reputation. In fact, defendants have no independent reputation. The consumer is not even aware of defendants' existence until after he has misdialed Holiday Inns' vanity number. If not for Holiday Inns spending millions of dollars on advertising each year, defendants would have no service whatsoever to provide to the consumer. For the defendants to be able to reap profits solely on the advertising efforts and expenditures of others seems to be a clear violation of the spirit, if not the letter, of the Lanham Act.

*Holiday Inns*, 86 F.3d at 624 (quoting *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 838 F.Supp. 1247 (E.D.Tenn.1993)). The Sixth Circuit, however, rejected this reasoning and held that, even though there was obviously confusion on the part of the consumers who called the defendant, the defendant had done nothing to create that confusion and could not be held liable under the Lanham Act. *Id.* The defendant's deliberate misuse of a protected mark is the "prerequisite to the finding of a Lanham Act violation." *Id.*

The Restatement states that there is no confusion over the source or sponsorship of goods "when a trademark is used to identify genuine goods marketed under that mark by the trademark owner." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24 cmt. b.

It is clear, therefore, that the court must consider evidence of actual confusion as evidence of a likelihood of confusion among consumers. But the court must also take into consideration the level of actual confusion, the kind of confusion that was created and whether the defendant intended to mislead consumers.

■ The plaintiff asserts that it has raised a disputed material fact of whether there is a likelihood of confusion by presenting evidence of actual confusion and evidence that Shop At Home intended to mislead consumers about its affiliation with McDonald's. It has cited testimony from the preliminary injunction hearing to support its contention that actual confusion exists. In that proceeding, McDonald's senior customer satisfaction representative, Julie Pottebaum, testified that the customer service department had received nine complaints that specifically mentioned the Shop At Home sales and nine calls complaining about other home shopping channels. (Docket No. 39 at 224–25) In these calls, Ms. Pottebaum testified, the "customers were upset because they felt that McDonald's was intentionally providing the inventory to Shop At Home." (*Id.* at 225) This actual confusion among consumers is proof of misrepresentation on the part of the defendants, McDonald's asserts.

While the number of instances of confusion are greater than the number in *Daddy's Junky Music Stores, Champions* or *Wynn*, the population that is aware of McDonald's trademarks dwarfs the plaintiffs' trademarks in the other cases. The plaintiffs' companies in the other cases are,

---

6. Holiday Inns' toll-free number is 1–800–HOLIDAY, which is 1–800–465–4329. The defendant in the case took the number 1–800– 405–4329, knowing that many people would dial a zero rather than the number six, on which the letter "O" is located.

at best, regional in nature, while McDonald's boasts almost universal recognition. In 1988, it was found to be the largest fast-food business in the world, with more than 95 percent of the American population having eaten at a McDonald's. *Quality Inns Int'l v. McDonald's Corp.,* 695 F.Supp. 198, 203 (D.Md.1988). It had more than 10,000 restaurants in 45 countries, serving more than 18 million people per day. *Id.* "The recognition of Ronald McDonald by children between the age of two and eight is 100 percent, a figure matched only by Santa Claus." *Id.* McDonald's position in the market today can be no less and probably has advanced.

Given this level of recognition, the potential pool for confused consumers is enormous and the production of sixteen phone calls borders on insignificant. Even if all sixteen callers believed that McDonald's had deliberately provided the toys to Shop At Home to sell, this would not be enough evidence to support a finding of a likelihood of confusion among consumers. But of these sixteen, not all callers evidenced confusion about whether Shop At Home was affiliated with McDonald's. Many merely stated that they were upset that the toys were being sold either on the internet or on one of the home shopping channels. (Docket No. 80, Ex. 11) Others called to alert McDonald's to the sales. While these consumers may have been confused, their confusion in most cases had nothing to do with an affiliation between McDonald's and the defendants.

To support its contention that the defendants deliberately misled consumers about their affiliation with McDonald's, the plaintiff submitted a transcript of a Shop At Home segment in which the Teenie Beanie Babies were on sale. (Docket No. 23, Ex. D) McDonald's contends that such broadcasts were "virtually guaranteed to result in—indeed, appear to have been designed to create—consumer confusion regarding [Shop At Home's] relationship with McDonald's and the source of the goods."

(Docket No. 70 at 28) In the segment, the host exhorts the audience to call to purchase the toys, using the enticement that, through Shop At Home, consumers could avoid standing in line, going to the drive-through or in any way visiting a McDonald's restaurant. (Docket No. 23, Ex. D at 3) From the announcer's viewpoint, a trip to McDonald's to get a toy would appear to be a thoroughly unpleasant experience. "You know how it gets. It just gets crazy, it gets wild, you get the wrong numbers, you're standing there—HEY!! Isn't there one more in there? Isn't there another Ants[7] or another Nut? ... But you're done with all that. And you're done with that for all three years." (*Id.*)

This evidence is similarly unpersuasive because nowhere in the transcript does the announcer even hint at being affiliated with McDonald's. If anything, this sales pitch appears to wage an anti-McDonald's campaign, meaning it would tend to convince most viewers that Shop At Home was competing with McDonald's for their business. Other than the conclusory statement that the marketing was guaranteed to cause confusion, McDonald's offers no rationale as to why a consumer would be confused by the Shop At Home sales pitch in a way that would lead McDonald's customers to believe that the defendants were connected to McDonald's in any way. This is especially true in light of the "crawl" that ran across the screen, stating that the toys came from secondary sources.

Even the cases cited by McDonald's require more evidence of deception on the part of the defendants. In *Bandag,* the court found that the defendant misled consumers, but in that case the defendant actually used a Bandag trademark in a way that falsely suggested he used the Bandag process to recap tires. *Bandag,* 750 F.2d at 907. The defendant sold Bandag recapped tires but also sold tires he recapped himself, and he did not use the Bandag method for his own recapping activities. The advertisement bearing the

---

7. Ants and Nut are the names of two of the Teenie Beanie Baby toys.

Bandag logo ran in the Yellow Pages. *Id.* In *Ernst Paul Lehmann Patentwerk v. San–Val Discount,* 1996 U.S.Dist. LEXIS 9899 (C.D.Cal.1996) (unpublished), the court found that although the defendant had used numerous displays, posters and promotions for a toy train manufacturer throughout his store, he never intentionally misled consumers because he never held himself out as an authorized dealer for the toy company. In spite of the numerous protected marks appearing in the defendant's store, the court did not find a likelihood of confusion.

The plaintiff's arguments that the defendants used deceptive trade practices to mislead the public about their affiliation with McDonald's are without merit. No case law cited by either party or discovered in the court's research support such a claim against the defendant.

### 2. "First sale doctrine"

In addition to its inability to show a likelihood of confusion, there are no material facts in dispute that would negate the defendants' "first sale" defense. In the May 28, 1999, proceedings regarding the plaintiff's request for a temporary restraining order, this court found that McDonald's was unlikely to succeed on the merits of its trademark claims because the first sale of the Teenie Beanie Baby toys occurred when the owner/operators of McDonald's restaurants did not return the toys to the distribution center. After that first sale, to the owner/operators, McDonald's intellectual property rights did not entitle it to exercise control over the toys. Based on this finding, it was incumbent upon McDonald's to present some factual basis or legal argument that would lead this court to a different conclusion. It has failed to do so.

■ The "first sale" doctrine, sometimes called the "exhaustion doctrine," is similar to the principle of the same name in copyright law. McCarthy § 25:41. However, while the purpose of copyright law is to promote the progress of science and useful arts by assuring authors a fair return for their labors, trademark law's purpose is to protect a trademark owner's goodwill and allow consumers to make decisions based upon accurate information. Elliot M. Abramson, *How Much Copying Under Copyright? Contradictions, Paradoxes, Inconsistencies,* 61 Temp.L.Rev. 133, 151 (1988). When considering the doctrine under trademark,

> a markholder may no longer control branded goods after releasing them into the stream of commerce. After the first sale, the brandholder's control is deemed exhausted. Down-the-line retailers are free to display and advertise the branded goods. Secondhand dealers may advertise the branded merchandise for resale in competition with the sales of the markholder (so long as they do not misrepresent themselves as authorized agents).

McCarthy, § 25:41 (quoting *Osawa Co. v. B & H Photo,* 589 F.Supp. 1163, 1173 (S.D.N.Y.1984)). It does not matter that the owner of the trademark objects to the use of its mark, as long as one approved sale has already occurred. Restatement (Third) of Unfair Competition § 24.

■ McDonald's argues that the first sale doctrine should not apply to this case because: (1) applying the doctrine to this case would protect an illegitimate sale, thereby defeating the goal of intellectual property law that protects the property owner's exclusive rights; (2) applying the doctrine would deny McDonald's its "just reward" for the goodwill in its trademark; and (3) McDonald's never conferred absolute title to the goods, so no sale of the intellectual property rights occurred. These arguments were largely rejected during the previous hearing and the plaintiff has done little to enhance their persuasiveness. They fail because: (1) a sale is not illegitimate merely because the trademark owner opposes it; (2) the plaintiff's "just reward" theory is not supported by valid case law; and (3) even if the "just reward" doctrine exists and can be applied as suggested by McDonald's, it would be inequitable to allow McDonald's to set up a

supply chain that shields it from liability yet allows it to exercise control over the goods while in the supply chain.

### a. Illegitimate sale

McDonald's asserts that because it did not approve of the toys' initial sale until they were sold to those who made food purchases, the sales by the franchisees to the defendants and other third parties were illegitimate, and therefore there could be no "first sale." McDonald's also continues to assert, without citation to controlling or persuasive authority, that merely because goods and money change hands along the supply chain, those transactions do not constitute sales for purposes of trademark law.

The plaintiff urges the court to follow the reasoning of *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224 (S.D.N.Y.1997), in which the court states, "Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner." *Claiborne*, 979 F.Supp. at 230 (quoting Restatement (Third) of Unfair Competition § 24, cmt. c (1995)). However, *Claiborne* is factually distinguishable from this case. In *Claiborne*, the defendant, which manufactured clothing for Liz Claiborne under the Claiborne trademark, was authorized to sell seconds and overruns to third parties under restrictive conditions, the scope of which was hotly contested. There were even allegations, based upon undercover investigation by Liz Claiborne, that the defendant was purposely manufacturing more garments than were ordered so that it could sell them to third parties. It is in this context that the court discussed the proposition that goods cannot be considered "genuine" until the trademark owner authorizes their sale "under the mark." *Id.* The court also discussed other fundamental aspects of trademark law that are more relevant to the facts of this case, namely:

> It is well settled that sale of genuine goods without authorization by the

trademark holder generally will not constitute trademark infringement.... [U]nder the exhaustion doctrine, "a markholder may no longer control branded goods after releasing them into the stream of commerce...."

*Claiborne*, 979 F.Supp. at 230 (quoting *Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984). *Claiborne* would be factually analogous if one of the Chinese manufacturers that produced the Beanie Babies for Simon or TMSW began selling the toys to an outlet mall. But here, the toys were "released into the stream of commerce" by the sales up the supply chain numerous times with McDonald's approval. That McDonald's did not approve of the alleged sale between the franchisees and the defendants makes little difference if McDonald's approved of the prior sales of the toys up to and including the sale to the franchisees.

This view of the law has been upheld since the Supreme Court issued its opinion in *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924). In *Prestonettes*, the defendant rebottled a trademarked perfume and repackaged and altered powder, which it sold in compacts. *Prestonettes*, 264 U.S. at 366–67, 44 S.Ct. 350. The labels on the defendant's goods stated that it was not associated with the original manufacturer of the products and explained that the products had been altered. *Id.* Justice Holmes found no trademark violation, holding that the defendant was merely exercising control over its own products as an owner and that the trademark owner had no control over the product after the first sale had occurred.

> The existence of a trademark would have no bearing on the question. Then what new rights does the trademark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.

*Prestonettes*, 264 U.S. at 368, 44 S.Ct. 350. The first sale of the trademarked perfume

and powder to the defendant isolated it from liability.

In *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir.1995), Sebastian sold its hair care products only to authorized professional salons, but Longs Drug Stores obtained and marketed Sebastian products.[8] Sebastian alleged that Longs had violated the Lanham Act because, "a survey it commissioned indicates that Longs's action of stocking and reselling Sebastian products bearing the collective mark has in fact confused consumers 'into believing [falsely] that there is some type of affiliation, association or approval between Longs and Sebastian....' " *Id.* at 1075. The Ninth Circuit, however, held that the first sale doctrine is not invalidated

> merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer. It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act.

*Id.* at 1076. The Fifth Circuit reached the same conclusion under similar facts in *Matrix Essentials, Inc. v. Emporium Drug Mart*, 988 F.2d 587 (5th Cir.1993). *See also, Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083 (9th Cir.1998); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296 (5th Cir.1997); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3rd Cir.1998); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir.1998).

In *Enesco*, the court applied the first sale doctrine to the sale of "Precious Moments" figurines that had been repackaged. *Enesco*, 146 F.3d at 1085–86. In *Iberia*, the Third Circuit overturned a low-er court ruling that found the first sale doctrine was inapplicable when a manufacturer sold products in Puerto Rico that were imported to the United States, allegedly violating Iberia's exclusive right to distribute the trademarked product in the United States. "If there are no material differences between the products sold, then the products offered by the alleged infringer are 'genuine' and an infringement action under Section 32 of the Lanham Act must fail." *Iberia*, 150 F.3d at 301–302.

McDonald's relies on *United States v. Masonite Corp.*, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), for the proposition that not every sale that looks like a first sale is one. However, *Masonite* is a patent case in which the central question is whether the defendants combined to restrain trade or commerce under the Sherman Act. *Id.* at 1072.

In this case, the defendants did nothing to alter the toys, even if agreements with McDonald's were breached. Like the cases cited above, there were no material differences between the product as manufactured and as sold to the consumer. Consumers who bought the toys from Shop At Home would not be deprived of any future rights nor would they be disappointed by receiving a lower quality toy than one purchased with a Happy Meal. They received precisely what they expected to receive and, as such, their goodwill remained intact.

### b. "Just reward"

The plaintiff next argues that there was no sale under the first sale doctrine in this case because McDonald's never received its "just reward" for its trademarked goods because it only receives payment through increased food sales brought about by the Teenie Beanie Baby toy promotion.[9] No court has defined the first·

---

8. Although the court did not officially determine how Longs obtained the products, it stated, "Longs presumably purchases Sebastian products from a salon or distributor who sells the product to Longs *in violation of its agreement with Sebastian*." *Sebastian*, 53 F.3d at 1074 (emphasis added).

9. The court will accept, for purposes of this motion, that McDonald's did not receive direct compensation for the toys. However, McDonald's did not introduce any evidence showing a decline in food sales, that they did not meet projections for sales under the pro-

sale of a trademarked good as taking place only when the trademark owner receives its just reward, and no court has defined trademark rights in the strained manner that is required to reach the conclusion urged by the plaintiff.

McDonald's stated in oral argument that trademark law provides trademark owners with a "bundle of rights," just like a property or patent owner receives a bundle of rights. Within that bundle is McDonald's right to distribute its product as it chooses and, if that control cannot be extended through its "supply chain," McDonald's loses its right to distribute, it asserts. If this is a right under trademark law, it is not contained within the text of the statute, nor is it articulated as such in any case law. In spite of the plaintiff's attempt to cobble together a newfound standard by selecting language from cases that do not apply, its theory of "just reward" being a necessary element to satisfy its "right to distribute" is unpersuasive.

McDonald's directs the court to *Platt & Munk Co. v. Republic Graphics, Inc.*, 315 F.2d 847 (2d Cir.1963), which contains language that, on its face, supports the plaintiff's position. *Platt & Munk* does state that the ultimate question in a *copyright* case is whether the copyright owner has received his reward, rather than whether the product has changed hands. *Platt & Munk*, 315 F.2d at 851. However, as discussed above, copyright and trademark law serve different purposes. While copyright law protects a fair return on the efforts of writers and creators, trademark law provides no such protection.

The court in *Denbicare v. Toys R Us*, 84 F.3d 1143 (9th Cir.1996), was not convinced that the just reward test should apply in trademark cases as it does in copyright but noted that, even if it did apply in some trademark cases, it would not apply when the trademark owner consented to the first sale. *Id.* at 1151. Under *Sebastian*, a first sale takes place when the product has been put on the open market—even if it has not reached

the hands of the ultimate consumer. *Sebastian*, 53 F.3d at 1075–76. In this case, McDonald's products were on the open market albeit on their way to the ultimate consumer—long before they reached the hands of Shop At Home or the other defendants. The sale to the franchisees was a first sale to which McDonald's consented. The earlier sales that took place along the supply chain might also qualify as first, second and other sales. Accordingly, McDonald's has no right to seek a just reward after giving consent to these sales.

The Supreme Court recently reversed a ruling in a case in which the Ninth Circuit relied upon *Platt & Munk* for the very copyright principle the plaintiff advances here. In *L'Anza Research Int'l, Inc. v. Quality King Distributors, Inc.*, 98 F.3d 1109 (9th Cir.1996), the Ninth Circuit held that a "gray market" case was not barred by the first sale doctrine, and it went on to quote *Platt & Munk*'s view on the owner's "reward." *Id.* The Supreme Court reversed, finding that there had been a first sale, even though the copyright owner may have lost money when goods sold abroad were imported against the company's wishes. *See Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998). So, even if the identical protections offered under copyright law were available to the plaintiff under trademark law, the first sale doctrine would bar this action under *Quality King Distributors*.

McDonald's argues further that, unless their "just reward" theory is followed with regard to a first sale,

> McDonald's would not be able to use its procurement system to get *any* of its goods to their intended market—whether Teenie Beanie Babies or McDonald's wrappers or even its food products—without 'risking the loss' of its trademark protection along the way. This outcome is not only illogical, but inimical to the 'sensible and stable accommodation between strong and potentially con-

motion or any other evidence that it did not

receive its "just reward" for the toys.

flicting forces' that the 'first sale' doctrine is designed to protect.

(Docket No. 70 at 15) (citations omitted) But this argument illustrates the clearly misguided view held by McDonald's that trademark law extends protections throughout the procurement system. If the McDonald's theory were true, that no first sale occurs until the company receives its "just reward" for that trademarked item, the protections of trademark law would extend far beyond any case yet decided.

McDonald's provided the court with a one-page analysis containing five cases that mention the *Platt & Munk* just reward analysis. None of these cases is binding precedent, all of them deal with copyrights, not trademarks, and none of them is persuasive for the position that McDonald's advances. *Beebe Bourne v. The Walt Disney Co.*, 68 F.3d 621 (2nd Cir.1995), is a complex copyright case in which the court discusses the defendant's "right to vend" that is provided for in the copyright statute. There is no such provision in the trademark statute. In addition, although the case does consider whether a first sale occurred under *Platt & Munk*, it rejects *Platt & Munk's* applicability to that case. It also considers the just reward theory, but not under *Platt & Munk*, and, in a fact-specific analysis, rejects its use in that case. So the case never endorses the theory, especially in a trademark context.

*Parfums Givenchy v. Drug Emporium*, 38 F.3d 477 (9th Cir.1994), deals with "gray-market goods" and, therefore, must be interpreted in light of the Supreme Court's 1998 decision in *Quality King Distributors*. *Quality King Distributors* ignored the lower court's use of *Platt & Munk's* "just reward" theory, and overturned the holding based upon that theory. Reliance upon *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378 (C.D.Cal.1993), is similarly flawed.

This case states that "the distribution right and the first sale doctrine rest on the principle that the copyright owner is entitled to realize no more and no less than the full value of each copy or phonorecord upon its disposition." *Id.* at 1388 But it is not clear whether this is good law under *Quality King Distributors* and, in any event, it is inapplicable to this case. It is, like *Parfums Givenchy v. Drug Emporium*, a case about the right of a copyright owner to control the importation and sale of gray market goods. *Sebastian International, Inc. v. Consumer Contacts Ltd.*, 847 F.2d 1093 (3rd Cir.1988), is also a "gray market" copyright case.

In *Novell, Inc. v. Weird Stuff, Inc.*, 1993 U.S.Dist. LEXIS 6674 (N.D.Cal.1993) (unpublished), the plaintiff is a software manufacturer attempting to prohibit the sale of computer software that had been retrieved from the company's garbage. Although Novell sought damages under both trademark and copyright law, the first sale doctrine is discussed only in the context of copyright law. And, in any event, there was no sale at all in *Novell*, so it does little to shed light on the case before this court.

Even if McDonald's could argue that it deserves its "just reward" for equitable reasons, the argument would not be persuasive. McDonald's has intentionally structured a supply chain that benefits it in a myriad of other ways. All of the entities in the supply chain operate completely independently of McDonald's, except to the extent that they have agreements with McDonald's not to sell the Beanie Babies and other products outside the supply chain.[10] McDonald's avoids liability while getting their goods into the stream of commerce. And McDonald's has other remedies—contained in their agreements—against these entities if, by breaching their agreements with McDonald's, McDonald's is denied its profit.

---

10. There is deposition testimony about the agreements within the supply chain, but it was not until oral argument that McDonald's revealed that most of the agreements are oral contracts.

While there may well be a first sale earlier in the supply chain, the court need not reach that conclusion. Even if the only sale that would qualify as a first sale is the sale to the franchisees, the actions of these defendants are beyond the scope of trademark protection. As soon as the franchisees accept shipments from the distribution centers—whether the shipments contain Teenie Beanie Baby toys, hamburger, hot apple pies or ketchup packets—the franchisees have purchased those shipments. The franchisee has an obligation under trademark law not to sell anything other than official McDonald's products under the guise of McDonald's golden arches. However, the franchisee's obligation to make sure the corporation receives its "just reward" is a separate matter protected not by trademark law, but by the franchise and shrink wrap agreements.

### c. No absolute title

The plaintiff's final argument is that there was no first sale because there was no transfer of "absolute title." The franchisees merely acquire a license to the toys that is limited by the shrink wrap agreement, and violating those terms may result in termination of the franchisee's rights to use McDonald's intellectual property, McDonald's argues.

Again, McDonald's cites *Platt & Munk* for this proposition, which is inapplicable and unpersuasive. McDonald's also cites three district court cases (one unreported) from California and New York, which are similarly inapplicable to this case. *Microsoft Corp. v. Harmony Computers & Electronics*, 846 F.Supp. 208 (E.D.N.Y.1994), is a copyright case. *Embedded Moments, Inc., v. Int'l Silver Co.*, 648 F.Supp. 187 (E.D.N.Y.1986), considers a summary judgment motion of a breach of a sales agreement claim. And in *Microsoft Corp.*

*v. ATS Computers, Inc.*, 1993 U.S.Dist. LEXIS 21132 (S.C.Cal.1993) (unpublished), the court considers whether ATS distributed Microsoft software in violation of copyright and trademark law. The opinion discusses the first sale doctrine only in terms of its application to copyright law and clearly considers distinct claims under the two types of law. "Indeed, the evidence adduced by Microsoft tends to show that either Defendants were distributing copyrighted material when they were not authorized to do so, or that they were distributing counterfeit material in violation of Microsoft's trademarks." *Microsoft*, 1993 U.S.Dist. LEXIS 21132 at *20.

McDonald's also asserts that, "A second component of the absolute title requirement is that the transfer must be authorized by the intellectual property holder." (Docket No. 70 at 17) This argument is rejected for the same reasons it was rejected in subsection a. above. McDonald's does not dispute the fact that it never held any title to the toys. And although it never relinquished its intellectual property rights—such as the right to prohibit any other companies from manufacturing their own Teenie Beanie Baby toys to be given away in a plastic bag bearing a McDonald's trademark—that did not give it the right to control the sale of property to which it did not hold any title.

### C. State claims

 The same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the Tennessee Consumer Protection Act ("TCPA"). Under the TCPA[11], there must be a deceptive act by the defendant to hold the defendant liable. *New Life Corp. of America v. Thomas*

---

11. TENN.CODE ANN § 47-18-104(b) lists 32 separate unfair or deceptive acts or policies. All involve some form of misrepresentation about goods or services. In a one-page document outlining its claims presented during oral argument, McDonald's directs the court to TENN.CODE ANN. § 47-18-104(b)(3), which defines an unfair or deceptive act as, "Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another. This subdivision does not prohibit the private labeling of goods or services …" *Id.*

*Nelson, Inc.,* 932 S.W.2d 921, 928 (Tenn. Ct.App.1996). As noted above, the defendants in this case did not attempt to deceive, nor did they actually mislead, consumers. Under Tennessee common law regarding trademark and unfair practices, like federal trademark statutes, the ultimate question is whether the defendant has created a likelihood of confusion among consumers. *Men of Measure Clothing, Inc. v. Men of Measure, Inc.,* 710 S.W.2d 43, 47 (Tenn.Ct.App.1985). The defendants did not create a likelihood of confusion and cannot be held liable for unfair practices under state common law.

McDonald's provided no argument or law disputing this in its response to the Motion for Summary Judgment, but in oral argument it asserted that there were differences in the claims. The court finds, however, that the plaintiff failed to provide any facts or legal argument that would distinguish the state claims from the Lanham Act claims.

### III. Conclusion

Viewing the facts in the light most favorable to the plaintiff, McDonald's may be able to show that it did not receive the proceeds from its efforts in marketing some of the Teenie Beanie Babies in its 1999 campaign. The sales that may have deprived McDonald's of these profits violated their franchise and shrink wrap agreements, and the defendants may have solicited the violation of those agreements. These are all losses that are protected by the various contracts McDonald's has entered into. They are not, however, losses that are protected by trademark law—either common law or statutory, state or federal. There are no material facts in dispute that would allow the plaintiff to succeed on these claims.

The Motion for Summary Judgment (Docket No. 61) filed by Shop At Home and the Motion for Partial Summary Judgment (Docket No. 58) filed by Sports Collectibles, Inc., Classic Collectibles, LLC. and Gary Fillers will be granted. Counts I, II, III and IV of the Amended Complaint will be dismissed. An appropriate Order will enter.

### ORDER

Pending before the court is a Motion for Partial Summary Judgment filed by Sports Collectibles, Classic Collectibles and Gary Fillers (Docket No. 58) and a Motion for Summary Judgment filed by Shop At Home, Inc. (Docket No. 61). McDonald's responded, the defendants replied and the court heard oral argument on these motions on December 20, 1999.

For the reasons stated in the accompanying Memorandum, the motions are **GRANTED** and Counts I, II, III and IV of the Amended Complaint are **DISMISSED.** Defendant Shop At Home is **DISMISSED** from the case. The case will proceed against the remaining defendants on Counts V and VI of the Amended Complaint.