**EMBEDDED MOMENTS, INC., Plaintiff,**

v.

**INTERNATIONAL SILVER COMPANY and Insilco Corporation, Defendants.**

No. 83 CV 5490 (ERK).

United States District Court, E.D. New York.

Oct. 3, 1986.

John Corbo, Port Washington, N.Y., for plaintiff.

Lawrence, Ciovacco & Walsh, P.C., Hempstead, N.Y., for defendants.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Plaintiff Embedded Moments, Inc. ("plaintiff" or "Embedded") filed this diversity action against defendants International Silver Company ("International") and Insilco Silver Corporation ("Insilco") for the breach of two separate alleged agreements, one allegedly entered into between Embedded and International on January 5, 1979 (the "Sales Agreement") and the second allegedly entered into between Embedded and International on January 15, 1979 (the "Licensing Agreement"). Plaintiff moves for partial summary judgment on count five of the second amended complaint, which is entirely based on the Sales Agreement, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Defendants cross-move for summary judgment on all counts of the second amended complaint pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

### A. *Plaintiff's Allegations*

Plaintiff, a New York corporation, alleges that in 1977 its predecessor-in-interest, a partnership also called Embedded Moments (the "partnership"), obtained from approximately thirty Las Vegas casinos the right to use the decorative designs used by the casinos in their hotel and gambling operations for various commercial projects that the partnership might devise utilizing these designs. The license from the Sands casino is typical of the licenses obtained by the partnership:

> This will confirm our agreement whereby we, the undersigned, grant to you, your successors and assigns, for and in consideration of $1.00 and other good and valuable consideration, the receipt of which is hereby acknowledged, the right and authority for a period of 7 (seven) years to copy and/or reproduce and/or create photographs, pictures, drawings, likenesses and facsimiles, of our hotel and/or casino, exterior and/or interior, all parts and/or places, and things used therein and/or thereout, including name, logo, emblem, trademark, designs, any and all of them, opened and/or used by any of the public and/or any of the patrons of our hotel and/or casino, for all legitimate commercial purposes, including production of souvenirs, momentos and memorabilia.
>
> The above rights are granted on a non-exclusive basis.

The licenses obtained from the other casinos were similar in most material respects except some purported to be irrevocable and some did not state that the rights granted were non-exclusive.

Plaintiff alleges that John Corbo, plaintiff's president and one of the partners in the partnership, subsequently came up with the idea of marketing a backgammon set utilizing the casino gambling chip designs. Each of the thirty pieces would be made of one ounce of sterling silver and would be stamped with the gambling chip design of a different casino. Corbo's idea was to take advantage of the rising popularity of backgammon and casino gambling in a single product.

In need of a financial backer, plaintiff approached International in 1978. Negotiations commenced in mid–1978. According

to plaintiff, the negotiations resulted in two distinct but related agreements. The first agreement (the Sales Agreement) allegedly permitted plaintiff to purchase the backgammon sets at a fixed price of $750 for resale by plaintiff through its mailing list as well as permitting plaintiff to distribute the backgammon sets to retailers, with plaintiff getting a fifteen percent discount off the normal wholesale price. Plaintiff claims that an in-house memorandum of International (the "January 5, 1979 memorandum") contains the terms of the alleged Sales Agreement.

The second alleged agreement (the Licensing Agreement) was allegedly entered into on January 15, 1979. The Licensing Agreement purports to grant International a license (in reality, a sublicense, since plaintiff was the original licensee) to utilize the casinos' chip designs on backgammon sets. In return, International is required to pay plaintiff a royalty of five per cent of its net sales of the backgammon sets, with a nonrefundable five thousand dollar advance on those royalties payable to plaintiff upon the signing of the Licensing Agreement. (Plaintiff concedes that International paid it this amount.) Paragraph seventeen of the Licensing Agreement provides that "[t]his Agreement constitutes the entire agreement of the parties hereto relating to the subject matter hereof." The Licensing Agreement also stipulates that it is to be interpreted under Connecticut law.

The second amended complaint purports to state seven causes of action. Count one asserts that 2,500 backgammon sets were in fact sold by International and seeks royalties on those sales pursuant to the Licensing Agreement. Count two claims that International breached the Licensing Agreement by assigning the agreement to another company in violation of an anti-assignment provision of the agreement. Count three alleges that in violation of the Licensing Agreement International failed to promote the backgammon sets. Count four asserts that International purchased or contracted for sufficient silver to fabricate 2,500 backgammon sets (75,000 ounc-

es), but used the silver for purposes other than manufacturing the backgammon sets as allegedly required by the Licensing Agreement. Count five is based on the failure of International to deliver the backgammon sets to plaintiff in alleged breach of the Sales Agreement. Count six claims that Insilco is jointly and severally liable for all of the foregoing on the theory that International is the alter ego of Insilco. The final count asserts that plaintiff is entitled to punitive damages.

### B. *The Motions for Summary Judgment*

Plaintiff filed a motion for summary judgment solely with respect to the fifth cause of action, which is based on the failure of International to deliver backgammon sets to plaintiff in alleged breach of the Sales Agreement. Defendants' cross-motion for summary judgment contains a multi-pronged attack on the complaint, which may be divided into two parts. The first part relates solely to the cause of action on the Sales Agreement, on which plaintiff seeks summary judgment. Defendants argue, *inter alia*, that the Sales Agreement is unenforceable because it fails to satisfy the requirements of the Statute of Frauds. The second part relates to both the Sales and Licensing Agreements. Defendants claim that both agreements are invalid because of the invalidity of the licenses plaintiff received from the various casinos.

### 1. *The Motions for Summary Judgment on The Fifth Cause of Action*

Plaintiff alleges that the Sales Agreement permitted plaintiff to purchase up to 2,500 backgammon sets at a fixed price of $750 for resale by plaintiff through its mailing list. The Sales Agreement also allegedly permitted plaintiff to distribute the backgammon sets to retailers, with plaintiff getting a fifteen percent discount off the normal wholesale price. According to plaintiff the terms of the Sales Agreement are contained in an in-house memorandum of International dated January 5,

1979. The memorandum provides in pertinent part:

> For the record, here is the agreement that Jim Dean and I worked out with John Corbo, Embedded Moments, Inc., the licensor of the Casino Chips.
>
> *1. Sets Sold to His Mailing List:*
>
> He will buy them from us at $750 each (our manufacturing cost approximately $350 each). The method of the mailing will be that he [sic] will supply him with up to 10,000 one-page, four-color sheets to be extracted from our own selling material. He will assemble and make other components of the mailing with a future delivery promise to the consumer of at least two months. The mailing will not be in our name, although our trademark can be used in direct relationship to the set itself. We will bill Corbo for the sets as they are shipped to the fulfillment house (Fosdick). Fosdick will bill Corbo for all expenses related to fulfillment. Any sets sold on this program will be ordered by Corbo and produced by us on a special request basis. No sets will be stocked for inventory.
>
> *2. Nevada Distributorship:*
>
> Corbo claims that he can place this set in all the major potential outlets for such products in Nevada. We have agreed to set him up as a distributor for Las Vegas, and at your option, for Reno and Tahoe. He would buy sets in quantity and sell on his own account. His discount will be 15% off a regular set. Standard freight and ad allowance provisions apply. His orders will be processed as our inventory permits.

On December 17, 1979, almost one year after the Sales Agreement was allegedly entered into, plaintiff attempted to exercise its alleged rights under the Sales Agreement. The letter plaintiff sent to International stated:

> There are 2,500 Casino Backgammon sets that were made. How many are left. The catolog [sic] number is 1709986S. Our price from you is $750.00 per set.
>
> Obviously you have sold the entire amount amount [sic].
>
> In the event that you have not sold all of the sets, or have any of them left, we hereby purchase all of the sets, the 2,500 and/or any of them that you have not sold for our agreed price of $750.00 per set. According to our agreement we also get 15 percent off this price. Delivery is to [be] made immediately.

It is not disputed that International did not deliver any backgammon sets to plaintiff. (International did give one set free of charge to plaintiff's president.) Plaintiff alleges that at the end of 1979, when plaintiff attempted to exercise its alleged rights under the Sales Agreement, the price of silver had risen to approximately $44.50 per ounce, from a price of approximately $4.50 per ounce at the time plaintiff and International allegedly entered into the Sales Agreement. Plaintiff attributes defendants' alleged breach of the Sales Agreement to this fact.

Defendants argue that the writing relied on by plaintiff in connection with the Sales Agreement is insufficient to satisfy the Statute of Frauds, since the January 5, 1979 memorandum does not state the quantity of backgammon sets defendants allegedly agreed to sell to plaintiff. Section 2–201(1) of the Uniform Commercial Code provides that a "contract is not enforceable ... beyond the quantity of goods shown in [the] writing."[1] Since no quanity is shown in the January 5, 1979 memorandum, defendants argue, the contract is not enforceable at all.[2]

---

1. This provision is the same under both New York and Connecticut law. It is therefore unnecessary to address the issue of whether New York or Connecticut law applies to this case.

2. Section 2–201(1) also provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Plaintiff does not dispute the applicability of this section to the Sales Agreement.

In response to defendants' Statute of Frauds argument plaintiff argues that a catalogue issued by defendant International to retailers in 1979 satisfies the Statute of Frauds requirement because the catalogue describes the backgammon set as a limited edition of 2,500 sets, which is the amount plaintiff claims defendants were obligated to sell to plaintiff. The Statute of Frauds may be satisfied by more than one writing, "provided that they clearly refer to the same subject matter or transaction." *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55, 110 N.E.2d 551, 554 (1953). *See also Kobre v. Instrument Systems Corp.*, 54 A.D.2d 625, 387 N.Y.S.2d 617, 618 (1st Dept 1976), *aff'd mem.*, 43 N.Y.2d 862, 403 N.Y.S.2d 220, 374 N.E.2d 131 (1978).

██ The catalogue may not be considered in conjunction with the January 5, 1979 memorandum to satisfy the Statute of Frauds, however, because it is wholly unrelated to the purported agreement between plaintiff and defendants. The only thing in common between the catalogue and the alleged Sales Agreement—other than the backgammon sets—is that both contain the number "2,500." The fact that the catalogue states that only 2,500 sets would be manufactured does not relate the catalogue to the alleged Sales Agreement for 2,500 sets. International's stated intention to manufacture only 2,500 backgammon sets does not mean that plaintiff was entitled to buy 2,500 sets but is rather a description of the product: each backgammon set is one of a limited edition and therefore presumably more valuable than a set which is but one of mass-produced millions. A device to enable defendants to sell their products to retailers, the catalogue describes numerous giftware items sold by defendants in addition to the disputed backgammon sets. Thus, the catalogue was directed to all of International's potential customers, not to plaintiff. Accordingly,

the Statute of Frauds has not been satisfied.

██ If, however, the Sales Agreement is deemed to be a requirements contract, the Statute of Frauds would not bar its enforcement. A requirements contract is one in which the buyer agrees to purchase his requirements exclusively from the other party to the contract. *See, e.g., Mason v. United States*, 615 F.2d 1343, 1346 n. 5 (Ct.Cl.), *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir.1979). A memorandum indicating that the contract is for the buyer's requirements, even though those requirements are uncertain, satisfies the Statute of Frauds even though the writing does not contain a definite quantity term. *Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F.Supp. 1354, 1364 (E.D.Pa.1980).

██ The Sales Agreement cannot be considered to be a requirements contract. First, plaintiff's own affidavit (Corbo Affidavit sworn to May 22, 1986, paragraph 37), asserts that the January 5, 1979 agreement was an options contract or a unilateral contract and is therefore totally at odds with the conclusion that the parties intended for the Sales Agreement to be a requirements contract. It is not the function of the court to "make a better contract for a party than the agreement the party made." *International Environmental Corp. v. International Telephone and Telegraph Corp.*, 397 F.Supp. 253, 254 (W.D.Okl. 1975).

Second, there is no promise by plaintiff that it will purchase its requirements for backgammon sets exclusively from defendants.[3] Plaintiff simply asserts that it was "entitled to purchase backgammon sets from defendants." (Corbo Affidavit sworn to January 9, 1986, paragraph 13.) The alleged agreement would leave plaintiff free to obtain silver backgammon sets from

---

**3.** It is this promise of exclusivity that provides the mutuality of obligation necessary to make the agreement an enforceable contract. *Mid-South Packers Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1121 (5th Cir.1985) (per curiam). Absent

this, the agreement is "an indefinite quantities contract, [where] without more, the buyer's promise is illusory and the contract unenforceable against the seller." *Mason, supra*, 615 F.2d at 1346 n. 5 (citations omitted).

anyone willing to provide them to plaintiff. Moreover, the fact that the January 5, 1979 memorandum contemplates that plaintiff *might* order sets from defendants is "not a promise by the [plaintiff] to purchase anything from the [defendant], much less its requirements." *International Environmental Corp., supra,* 397 F.Supp. at 255.

■ Indeed, there is no indication that plaintiff ever had any requirements for backgammon sets. Plaintiff does not allege or provide any evidence that it had obtained—or even attempted to solicit—customers to purchase the backgammon sets. Instead, the evidence suggests that plaintiff decided to exercise its alleged option when the price of silver increased significantly in value in order to take advantage of the increased value of the raw materials in the backgammon sets, not to fulfill any orders for the backgammon sets.[4] Since plaintiff did not have any requirements for backgammon sets, as opposed to a desire to obtain silver at below market prices, the Sales Agreement would be unenforceable even if it were deemed to be a requirements contract. *National Home Products Co. v. Union Carbide & Carbon Corp.,* 281 A.D. 604, 121 N.Y.S.2d 130, 131–32 (1st Dep't), *aff'd. mem.,* 306 N.Y. 638, 116 N.E.2d 245 (1953).

Thus, even if plaintiff's allegations are taken to be true, the Sales Agreement is not an enforceable contract.[5] Accordingly, there are no issues of material fact with respect to count five of the second amended complaint, making summary judgment appropriate.

**4.** For example, plaintiff's letter to International dated January 4, 1980 provides in part:
> As I am writing this letter to you the price of silver is approximately $40.00 per ounce and the Casino Backgammon Set has an intrinsic value, as to the silver alon[e], of approximately $12,000.00.

Plaintiff's affidavit makes clear that plaintiff bases its compensatory damages claim not on any sales of backgammon sets allegedly lost due to International's failure to supply plaintiff's "requirements," but rather on the fact that International instead of plaintiff obtained the benefit of the rising price of silver. (Corbo Affidavit sworn to January 9, 1986, paragraphs 44–55.)

**2. *The Remaining Motions for Summary Judgment***

Defendants also argue that they are entitled to summary judgment on all seven counts of the second amended complaint on the theory that the licenses granted to plaintiff's predecessor-in-interest are void because they contain no provision for supervisory control over the licensee. Because these licenses are void, defendants conclude, the alleged Sales and Licensing Agreements based on those licenses are also void. Plaintiff responds by denying the applicability of the requirement of supervisory control to these licenses,[6] but asserts that in any event there was sufficient provision for control because the casinos could revoke their licenses at any time if they were dissatisfied with the licensed products.

■ Defendants correctly note that a "naked" license—i.e., one without supervisory control over the use of the trademark—is invalid. *Cartier, Inc. v. Three Sheaves Co. Inc.,* 465 F.Supp. 123, 129 (S.D.N.Y.1979); *Weight Watchers of Quebec Ltd. v. Weight Watchers International, Inc.,* 398 F.Supp. 1047, 1052 n. 21 (E.D. N.Y.1975); *Susser v. Carvel Corp.,* 206 F.Supp. 636, 641 (S.D.N.Y.1962), *aff'd,* 332 F.2d 505 (2d Cir.1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). "[T]he purpose of the control requirement is to avoid the danger that the public may be deceived as to the quality of a product sold under a recognized [mark]." *Syntex Laboratories v. Norwich Pharma-*

**5.** Defendants insist that plaintiff and International never entered into the Sales Agreement. According to defendants the January 5, 1979 memorandum merely represents a phase in the negotiations between the parties. Given the resolution of defendants' arguments based on the Statute of Frauds, it is unnecessary to address this factual dispute and the other arguments raised by defendants in support of their motion for summary judgment on count five.

**6.** Plaintiff does not cite to any authority for this proposition nor has independent research disclosed any.

194

cal Co., 315 F.Supp. 45, 56 (S.D.N.Y.1970), aff'd, 437 F.2d 566 (2d Cir.1971) (citation omitted). Given the possibility of deception, a naked license "is a fraud upon the public and unlawful." *Societe Comptoir de L'Industrie Cotonniere Establishments Boussac v. Alexander's Department Stores Inc.*, 299 F.2d 33, 35 (2d Cir. 1962) (citations omitted).

The licenses from the casinos to the partnership do not contain any explicit provision for the exercise of supervisory control by the casinos. It is not necessary, however, for the licenses themselves to contain a written provision for control; actual control by the licensor is sufficient. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 368 (2d Cir.1959); *National Lampoon, Inc. v. American Broadcasting Companies, Inc.*, 376 F.Supp. 733, 737 (S.D.N.Y.), aff'd per curiam, 497 F.2d 1343 (2d Cir.1974); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F.Supp. 892, 918 (S.D.N.Y.1968), *modified on other grounds and aff'd*, 433 F.2d 686 (2d Cir. 1970). *See also* J. Gilson, *Trademark Protection and Practice*, Section 6.01[6] at 6–11.

Although there is no indication that the original licensors (the casinos) inspected the product manufactured by International, the ultimate licensee, the requirement of control should be construed in light of the reason for the requirement, which is the need to prevent deception of the public. *Syntex Laboratories, Inc., supra*, 315 F.Supp. at 54. Prior cases establish "that reliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides the basis for such reliance." *Syntex Laboratories, Inc., supra*, 315 F.Supp. at 56 (citing *Land O'Lakes Creameries v. Oconomowoc Canning*, 330 F.2d 667, 670 (7th Cir.1964)).

In November, 1977, according to plaintiff, the partnership entered into an agreement with International Hat Company ("IHC"), pursuant to which IHC was granted a sublicense to use the designs of the casino chips on hats. According to plain-

tiff, IHC in fact manufactured hats utilizing the casino chip designs pursuant to this agreement. Plaintiff asserts that in May, 1978 the partnership sent samples of the products manufactured by IHC to the casinos whose designs were used.

Plaintiff claims to have sent letters in late November, 1979 to the casinos that had granted the partnership the initial licenses. These letters—each of which is identical—purport to confirm that plaintiff consulted with the casinos regarding the design and manufacture of the backgammon sets, giving the casinos the opportunity to correct those aspects of the backgammon sets objectionable to the casinos. These letters also purport to confirm that this procedure was also followed with respect to the hats manufactured by IHC.

▮ The trier of fact in this case could reasonably infer, if plaintiff's evidence is believed, that the casinos in fact relied on the integrity of plaintiff's president based on their prior relationship with him. The manner in which plaintiff's president handled the earlier licensing venture with IHC by giving the casinos the opportunity to review the products utilizing their trademarks and the casinos willingness to continue the relationship would support such a finding. Moreover, the IHC venture would also suffice to show "a history of trouble-free manufacture." These facts, if proven at trial, would be sufficient to establish compliance with the requirement of supervisory control. Accordingly, defendants' motion for summary judgment based on the alleged insufficiency of the licenses from the casinos is denied.

▮ Defendants also argue that if the licenses granted by the casinos to the partnership were in fact revocable at will, then this constitutes fraud vitiating any liability of defendants under the Sales Agreement and the Licensing Agreement, because in the Licensing Agreement plaintiff affirmatively represented that "during the life of this Agreement [it] will have the rights and authorities" to use the casinos' gambling chip designs. Defendants do not allege, however, that any of the casinos in fact

revoked their licenses to plaintiff during the term of the Licensing Agreement. Because defendants suffered no injury due to this alleged misrepresentation, they cannot assert that plaintiff defrauded them. *Cf. Cohen v. Brown, Harris, Steven, Inc.,* 64 N.Y.2d 728, 731, 485 N.Y.S.2d 745, 747, 475 N.E.2d 116 (1984) (no cause of action for fraud when no injury from alleged misrepresentation).

■ In addition, defendants argue that two of the casinos, Caesars Palace and Desert Inn, asserted claims of trademark infringement and unfair competition against International after International began selling the backgammon sets. Defendants assert that plaintiff failed to adequately resolve these claims, as required by the Licensing Agreement. Plaintiff's evidence, however, if believed, indicates that the dispute with the casinos was quickly resolved. Accordingly, there exist material issues of fact which preclude summary judgment for defendants on this basis.

### C. *The Punitive Damages Claim*

■ Defendants also move to dismiss count seven of the second amended complaint, which purports to state a cause of action for punitive damages based on the alleged breaches of contract described in the first six counts of the second amended complaint. There is no separate cause of action for punitive damages. *Laks v. Springer,* 101 A.D.2d 1001, 476 N.Y.S.2d 951, 952 (4th Dep't 1984). The seventh count will therefore be treated as a demand for punitive damages and defendants' motion deemed a motion to strike the demand pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Punitive damages are not recoverable for breach of contract under either New York or Connecticut law. *See, e.g., Brink's Inc. v. City of New York,* 717 F.2d 700, 704 (2d Cir.1983); *Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81, 85 (2d Cir.1982); *Triangle Sheet Metal Works v. Silver,* 154 Conn. 116, 222 A.2d 220, 225 (1966). Accordingly, the motion to strike the demand for punitive damages is granted.

## CONCLUSION

Plaintiff's motion for partial summary judgment is denied. Defendants' cross-motion for summary judgment is granted with respect to count five. Defendants' cross-motion for summary judgment with respect to count seven is deemed a motion to strike and is granted. Defendants' cross-motion for summary judgment is otherwise denied.

SO ORDERED.