# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

HEADSPACE INTERNATIONAL LLC,
a limited liability company formed in the
State of California,

Appellant,

v.

PODWORKS CORP., a corporation in
the State of Washington; and THOMAS
WERTH, an individual residing in the
State of Washington,

Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 77016-1-I

PUBLISHED OPINION

FILED: October 29, 2018

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2018 OCT 29 AM 9: 14

DWYER, J. — Headspace International LLC (Headspace), a California-based marijuana business, filed this lawsuit alleging infringing use of its mark, "THE CLEAR," by Podworks Corp., a Washington-based marijuana business, and Thomas Werth, Podworks Corp.'s chief executive officer (collectively, Podworks). In response, Podworks filed a CR 12(b)(6) motion to dismiss all claims. The trial court granted the motion, ruling that Headspace did not allege any lawful use of its mark in the ordinary course of trade in Washington and therefore had no trademark rights in "THE CLEAR" in Washington. Holding that Headspace did allege lawful use of its mark in the ordinary course of trade in Washington, we reverse.

I

On January 26, 2017, Headspace filed suit against Podworks alleging trademark infringement, unfair competition, unfair business practices, and violation of the Washington Consumer Protection Act, chapter 19.86 RCW. Headspace made the following factual allegations in its complaint:

> [Headspace], is and has been for many years, a well-known seller and licensor of concentrated and refined essential plant oils including cannabis concentrates, vapor related products, educational and other services sold under the trademark THE CLEAR. [Headspace] developed a notoriety in the cannabis industry because their in-house chemist and engineer developed a proprietary chemical process to create highly refined essential plant oils including cannabis concentrates. [Headspace] has, since April 10th 2013, adopted and used the mark THE CLEAR for its products in California and for its services including licensing the mark THE CLEAR in Washington State. . . .

> . . . Since the initial use of THE CLEAR, [Headspace] has continually used the mark for its products and services. [Headspace]'s Washington State trademark registration was granted by the Washington State Secretary of State on December 15th, 2014, file number 57531, in class 34 – cannabis concentrates.

> . . . .

> . . . In 2014 [Headspace] entered into an agreement to license their proprietary chemical process and THE CLEAR mark to X-Tracted Laboratories 502 Inc., a Washington State business that is licensed with [the] Washington Liquor and Cannabis Board. X-Tracted Laboratories 502 Inc. sells and distributes various marijuana related products, including cannabis concentrates, in Washington State. X-Tracted Laboratories 502 Inc. licensed [Headspace]'s THE CLEAR mark to use on cannabis concentrates and related products sold and/or used in commerce in Washington State. X-Tracted Laboratories 502 Inc. continues to license [Headspace]'s proprietary chemical process and use [Headspace]'s THE CLEAR mark in commerce in Washington State according with its Washington Liquor and Cannabis Board license.

Headspace further alleged that Podworks had used and continues to use the mark "THE CLEAR," or "CLEAR," for the sale of cannabis concentrates in Washington. Headspace also alleged that it sent Podworks a cease and desist letter, informing Podworks of its trademark for the mark "THE CLEAR," and demanding that Podworks immediately terminate further use of the mark or confusingly similar marks. Podworks refused, and Headspace filed this lawsuit.

Podworks responded by filing a CR 12(b)(6) motion to dismiss all claims against it for failure to state a claim upon which relief could be granted. Podworks argued that Headspace failed to allege that it had trademark protection in Washington for its mark "THE CLEAR," because it did not allege lawful use of the mark in the ordinary course of trade in Washington. The trial court granted the motion, reasoning that Headspace failed to allege lawful use of its mark in the ordinary course of trade in Washington and holding that there "is no claim for trademark infringement where the plaintiff does not allege that its mark is lawfully placed in the ordinary course of trade."

Headspace appeals.

## II

Headspace asserts that the trial court erred by dismissing its complaint for failure to state a claim. Specifically, Headspace contends that it alleged lawful use of its mark in the ordinary course of trade in Washington and, therefore, had trademark protection for its mark pursuant to Washington's trademark statute. We agree.

We review dismissals pursuant to CR 12(b)(6) de novo. Wash. Trucking Ass'ns v. Emp't Sec. Dep't, 188 Wn.2d 198, 207, 393 P.3d 761, cert. denied, 138 S. Ct. 261 (2017). Dismissal is appropriate only when "it appears beyond doubt that the plaintiff cannot prove any set of facts, consistent with the complaint, justifying recovery." Hipple v. McFadden, 161 Wn. App. 550, 556, 255 P.3d 730 (2011). When reviewing a CR 12(b)(6) dismissal, we presume all factual allegations in the complaint to be true and also consider any hypothetical facts, consistent with the complaint, proffered by the plaintiff. Gorman v. Garlock, Inc., 155 Wn.2d 198, 214, 118 P.3d 311 (2005).

To determine whether Headspace obtained trademark protection for its mark pursuant to Washington law, we must interpret our state's trademark statute, codified at chapter 19.77 RCW. Washington's trademark statute is based on the Model State Trademark Bill (MSTB) produced by the International Trademark Association. In the most recent update to the statute, the Senate and House Committees on the Judiciary recommended updating Washington's trademark statutes to more closely conform to federal law and the MSTB. See FINAL B. REP. on S.B. 5122, 58th Leg., Reg. Sess. (Wash. 2003).

One of the assumed benefits for states that have adopted the MSTB is that it is designed to enable state courts interpreting state trademark statutes to rely on federal court decisions interpreting federal trademark law, as set forth in the Lanham Act, 15 U.S.C. § 1051.[1] Our state legislature affirmed this

---

[1] See Anne W. Glazer, INTA's Model State Trademark Bill: Modernizing and Harmonizing U.S. State Trademark Laws, 64 INTA BULL. (Oct. 1, 2009), http://www.inta.org/INTABulletin/Pages/INTAsModelStateTrademarkBillModernizingandHarmonizingUSStateTrademarkLaws.aspx [https://perma.cc/8UWC-RN5P].

assumption by explicitly instructing Washington courts to construe the language of our trademark statute in accordance with federal decisions interpreting the Lanham Act. RCW 19.77.930.

Our Supreme Court has employed just such an approach. In Seattle Endeavors, Inc. v. Mastro, 123 Wn.2d 339, 345, 868 P.2d 120 (1994), the court explained that trademark infringement claims brought pursuant to Washington's trademark statute are evaluated consistently with prevailing federal standards, noting that the analysis employed by federal courts "operates tacitly in Washington trademark cases." Thus, consistent with the direction provided by both the legislature and our Supreme Court, we turn to federal court interpretations of the Lanham Act to guide our interpretation of the requirements of our state trademark statute.

Both the Lanham Act and Washington's trademark statute require that a mark be used before it will receive trademark protection. See RCW 19.77.030; CreAgri, Inc. v. USANA Health Scis., Inc., 474 F.3d 626, 630 (9th Cir. 2007). Federal law requires lawful use in commerce, CreAgri, 474 F.3d at 630, and Washington's statute contains an analogous provision requiring that a mark be placed in the ordinary course of trade in Washington. See RCW 19.77.010(11).[2] Although Washington's statute does not explicitly state that such placement must

---

[2] The full text of RCW 19.77.010(11) states:
A trademark shall be deemed to be "used" in this state when it is placed in the ordinary course of trade and not merely to reserve a right in a mark in any manner on the goods or their containers, or on tabs or labels affixed thereto, or displayed in connection with such goods, and such goods are sold or otherwise distributed in this state, or when it is used or displayed in the sale or advertising of services rendered in this state.

be lawful, such a requirement is clearly implied. As the Ninth Circuit explained when interpreting the federal lawful use requirement:

> [A]s a logical matter, to hold otherwise would be to put the government in the "anomalous position" of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws . . . [and] as a policy matter, to give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations would be to reward the hasty at the expense of the diligent.

CreAgri, 474 F.3d at 630. To avoid placing the government in such an "anomalous position," we interpret Washington's statute to require lawful placement of a mark in the ordinary course of trade.

Here, the allegations in Headspace's complaint, when treated as verities, are sufficient to satisfy its obligation to allege a set of facts that could justify recovery. The allegations of the complaint, as well as hypothetical facts consistent with the complaint, set forth the following: (1) that Headspace used its mark "THE CLEAR" in Washington when it licensed the mark to X-Tracted Laboratories 502 Inc. (X-Tracted) and that X-Tracted placed the mark on cannabis concentrates placed in the ordinary course of trade in Washington; and (2) that such use was lawful because such a licensing agreement was and is not prohibited by Washington's Uniform Controlled Substances Act, codified at chapter 69.50 RCW (CSA), when it does not require Headspace to produce, process, or sell cannabis products in Washington.

A

Headspace asserts that it alleged use of its mark in the ordinary course of trade in Washington when it alleged X-Tracted's use of the mark on cannabis products X-Tracted produced and sold in Washington. In response, Podworks avers that such indirect placement of the mark in the ordinary course of trade in Washington does not satisfy the requirements of the statute. We disagree. It does not matter if the use of the mark is direct or indirect. Either can be sufficient to satisfy the requirements of the statute.

While the language of RCW 19.77.010(11) does not directly speak to whether indirect placement by another inures to the benefit of the owner of a mark, common law principles and federal court interpretations of the Lanham Act support the view that indirect placement can be sufficient. It is an established principle of the common law of trademark that indirect use of a protected mark by a licensee inures to the benefit of the owner of the mark when the owner has sufficient control over the quality of the goods or services provided to customers under the licensed mark. See RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 cmt. b (AM. LAW INST. 1995) ("If the trademark owner exercises reasonable control over the nature and quality of the licensee's goods or services, the benefits of the licensee's use accrue to the trademark owner."); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:52 (4th ed. 1996).

Similarly, federal courts have opined that the licensing of trademarked marks is permissible under the Lanham Act when the trademark owner has

sufficient control over the quality of goods or services produced by the licensee. Although federal courts have not uniformly applied a single analytical approach to determining the extent of control over quality necessary for a mark's owner to retain trademark rights, they have generally focused on three factors when making such a determination: (1) contract language authorizing control over the licensee by the licensor,[3] (2) whether the licensor exercised actual control over the licensee,[4] or (3) whether the product quality over time was sufficient for the licensor to rely on the licensee to ensure quality control.[5] In a recent decision discussing this question, the Ninth Circuit analyzed all three factors when determining whether a licensor maintained sufficient control over the quality of goods or services produced by the licensee. See FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 516-19 (9th Cir. 2010) (finding no evidence to show contractual control, actual control, or control pursuant to sufficient grounds to trust in the quality control procedures of the licensee). Because federal courts have found sufficient control over quality based on any of the three factors, we apply the Ninth Circuit's test evaluating all three factors to determine whether any factor supports an assertion that the licensor possesses sufficient control over quality.

---

[3] See, e.g., Arthur Murray, Inc. v. Horst, 110 F. Supp. 678, 679 (D. Mass. 1953) (holding the license valid and trademark rights maintained because the contract language provided for licensor's control over the quality of services provided by licensee).

[4] See, e.g., Embedded Moments, Inc. v. Int'l Silver Co., 648 F. Supp. 187, 194 (E.D.N.Y. 1986) (explaining that it was not necessary for the license agreements to contain explicit provisions for the exercise of control and that actual control by licensor is sufficient to maintain trademark rights).

[5] See, e.g., Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985) (holding that, although licensor did not inspect the products, quality control was maintained by reliance on the integrity and control procedures of licensee where licensor and licensee were in a close working relationship).

Here, Headspace's complaint did not specifically allege that it retained control over X-Tracted's production of cannabis concentrates. Instead, in its briefing, Headspace proffered hypothetical facts consistent with the allegations in its complaint that could support a claim that it had sufficient control over X-Tracted's production of cannabis concentrates to maintain trademark rights. Specifically, Headspace proffered, both in the trial court and in its briefing on appeal, that its license agreement with X-Tracted included terms that provided Headspace sufficient quality assurances. Furthermore, it is not inconsistent with the allegations of the complaint to hypothesize that Headspace could have relied on the quality control measures utilized by X-Tracted. Because either the hypothetical quality control terms in the license agreement or Headspace's hypothetical reliance on X-Tracted's quality control measures would satisfy the applicable test for quality control, we hold that Headspace has made the necessary showing that it alleged use of its mark "THE CLEAR" in the ordinary course of trade in Washington.

B

Podworks next contends that even if Headspace exercised sufficient control over the quality of the goods produced and sold by X-Tracted, such control necessarily constituted a violation of the CSA and, therefore, cannot satisfy the requirement of lawful placement of the mark in the ordinary course of trade. We disagree.

i

Podworks first asserts that Headspace's licensing agreement with X-Tracted directly violated the CSA at the time Headspace filed its lawsuit. This is so, Podworks avers, because the agreement necessarily required Headspace to participate in X-Tracted's processing of marijuana products, which it was legally prohibited from doing.

In 2012, Washington voters approved Initiative Measure 502, LAWS OF 2013, ch. 3, codified as part of chapter 69.50 RCW (I-502), setting forth the circumstances attendant to the legal possession and sale of marijuana. I-502 modified the CSA by establishing a framework pursuant to which individuals and businesses could apply to the Washington State Liquor and Cannabis Board (WSLCB) for licenses to legally produce, process, or sell marijuana products in Washington. RCW 69.50.325. To avoid conflicting with those federal interstate commerce laws and regulations prohibiting the possession and sale of marijuana products, licenses may not be issued to out-of-state companies or individuals. RCW 69.50.331(1)(b). In addition, businesses that obtain a license to produce, process, or sell marijuana products must not permit any other person or entity to use the license or to participate in the production, processing, or sale of marijuana products. RCW 69.50.325.

Here, Headspace is an out-of-state company that is not permitted to obtain a license to produce, process, or sell marijuana products in Washington. However, Headspace's alleged licensing agreement with X-Tracted does not necessarily require that Headspace participate in X-Tracted's processing of

marijuana products. While Podworks asserts that the only way that Headspace could have sufficiently controlled the quality of X-Tracted's products was to be directly involved in the processing of X-Tracted's marijuana products, this is not so. Headspace could have ensured the necessary quality through contractual means or by relying on X-Tracted's quality control measures. Headspace's alleged licensing agreement arranged for Headspace to provide X-Tracted with the formula or recipe for processing cannabis concentrates and the right to place Headspace's mark on those concentrates X-Tracted processed using said formula or recipe. The agreement as alleged did not require Headspace to actually participate in the processing or sale of those products. Because no provision of the CSA prohibited Headspace from reaching such an agreement with X-Tracted, Podworks' contention that the agreement necessarily violated the CSA fails.

ii

Podworks next asserts that a recently added provision of the CSA stating that trademark and proprietary information licensing agreements are lawful, enacted in 2017 as part of Engrossed Substitute Senate Bill (ESSB) 5131[6] and codified at RCW 69.50.395, necessarily implies that such agreements were illegal prior to the enactment of ESSB 5131. To be sure, because the alleged licensing agreement never required Headspace to produce, process, or sell cannabis in Washington, nothing in the pre-amendment CSA specifically addressed this matter. Similarly, because X-Tracted's processing and sale of

---

[6] ENGROSSED SUBSTITUTE S.B. 5131, 65th Leg., Reg. Sess. (Wash. 2017).

cannabis was lawful, the licensing agreement did not make Headspace an accomplice to any wrongdoing. This leaves Podworks with only the argument that an implied prohibition existed prior to ESSB 5131's enactment. We next analyze this claim.

When construing a law adopted by initiative, "[t]he collective intent of the people becomes the object of the court's search for 'legislative intent.'" Dep't of Revenue v. Hoppe, 82 Wn.2d 549, 552, 512 P.2d 1094 (1973). "If a statute is ambiguous, we may look to the statute's subsequent history to clarify the original legislative intent." Jane Roe v. TeleTech Customer Care Mgmt. (Colorado) LLC, 171 Wn.2d 736, 751, 257 P.3d 586 (2011).[7] Upon the adoption of an amendment to a statute, the "new legislative enactment is presumed to be an amendment that changes a law rather than a clarification of the existing law, but the presumption may be rebutted by clear evidence that the legislature intended an interpretive clarification." Jane Roe, 171 Wn.2d at 751. "One indication a new enactment is a clarification is that the original statute was ambiguous." Jane Roe, 171 Wn.2d at 751. The statements of individual lawmakers, especially bill sponsors, can also be instructive in discerning the reasons for changes in legislation. In re Marriage of Kovacs, 121 Wn.2d 795, 807-08, 854 P.2d 629 (1993).

---

[7] As regards the utility of subsequent history to interpret the pre-amendment version of a statute, we see no pertinent distinction between the original legislative intent of a law passed by the legislature and the original legislative intent of a law approved by initiative. Our constitution permits the legislature to freely amend statutes enacted by initiative measures provided that, for the first two years subsequent to approval by the voters, amendments to, or repeal of, statutes enacted by initiative measures obtain the approval of two-thirds of the members of each house of the legislature. CONST. art. II, § 1(c). Therefore, just as a subsequent legislature may clarify the laws passed by an earlier legislature through subsequent amendment, so too may the legislature, via subsequent amendment, clarify the laws passed by an earlier direct vote of the people.

One of the stated purposes of I-502 was to take "marijuana out of the hands of illegal drug organizations and bring[ ] it under a tightly regulated, state-licensed system similar to that for controlling hard alcohol." LAWS OF 2013, ch. 3, § 1(3). To achieve this purpose, I-502 requires that the WSLCB strictly monitor and regulate Washington's cannabis industry. See RCW 69.50.325. Subsequent to I-502's passage, the WSLCB developed regulations to comply with its statutory obligations. However, these regulations did not include a requirement that all trademark and proprietary information licensing agreements be disclosed to the agency.

In 2017, our legislature passed ESSB 5131, which added a provision to the CSA entitled "Licensed marijuana businesses may enter into certain licensing agreements or consulting contracts—Disclosure to state liquor and cannabis board." This provision states:

> (1) A licensed marijuana business may enter into a licensing agreement, or consulting contract, with any individual, partnership, employee cooperative, association, nonprofit corporation, or corporation, for:
> (a) Any goods or services that are registered as a trademark under federal law or under chapter 19.77 RCW;
> (b) Any unregistered trademark, trade name, or trade dress; or
> (c) Any trade secret, technology, or proprietary information used to manufacture a cannabis product or used to provide a service related to a marijuana business.
> (2) All agreements or contracts entered into by a licensed marijuana business, as authorized under this section, must be disclosed to the state liquor and cannabis board.

RCW 69.50.395.

During Senate committee hearings on the bill, Senator Ann Rivers, the bill's sponsor, explained that the bill "is just a clean-up bill." Hr'g on S.B. 5131

- 13 -

Before the S. Commerce, Labor and Sports Comm., 65th Leg., Reg. Sess., at 59 min., 17 sec. (Jan. 19, 2017) (statement of Senator Ann Rivers, sponsor of SB 5131), *video recording by TVW*, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2017011226. Similarly, before the House Committee on Commerce and Gaming, Senator Rivers explained that "what we are trying to do with this is continue the regulation of our big experiment [with the marijuana industry]." Hr'g on S.B. 5131 Before the H. Commerce and Gaming Comm., 65th Leg., Reg. Sess., at 24 min., 41 sec. (Mar. 20, 2017) (statement of Senator Ann Rivers, sponsor of SB 5131), *video recording by TVW*, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2017031214. The legislative history of the bill is devoid of any indication that members of the legislature were of the view that, at the time, trademark and proprietary information licensing agreements were illegal or that the bill was designed to authorize their lawful existence.

The intent of the voters who approved I-502 was clear: to legalize the business of producing, processing, and selling marijuana pursuant to a strict regulatory framework. However, the WSLCB did not view I-502 as authorizing or requiring it to monitor all licensing agreements entered into by licensed marijuana businesses for trademarks and proprietary information relating to the processing of marijuana products. As a result, the WSLCB did not develop the regulations necessary to monitor the industry's use of such agreements, contravening the intent of the voters as perceived by the legislature. To correct this misperception by the executive branch agency and "continue the regulation" of Washington's

experiment with legal marijuana, the legislature passed a "clean-up bill" that, in part, clarified for the WSLCB its obligation to monitor licensing agreements entered into by licensed marijuana businesses. ESSB 5131's legislative history is devoid of any indication that the legislature sought to make legal any licensing agreements that had been previously illegal. Instead, its purpose was to better regulate that which I-502 had previously legalized.

### iii

Podworks next asserts that if Headspace actually possessed the amount of control over the quality of X-Tracted's cannabis products necessary to protect its trademark rights, such control would have necessarily made Headspace a "true party of interest" of X-Tracted. Podworks also avers that this would have required disclosure of the agreement (and Headspace's status as a "true party of interest") to the WSLCB. Furthermore, Podworks reasons, because Headspace did not allege that X-Tracted had ever reported that Headspace was a "true party of interest" to the WSLCB, the alleged use of Headspace's mark by X-Tracted could not have been lawful. We disagree. Podworks' argument is unavailing because Headspace could have possessed the required control over quality to maintain its trademark rights without becoming a "true party of interest."

The definition of a "true party of interest" is set forth in WAC 314-55-035. The regulation requires that all "true parties of interest" be listed on a marijuana business's license. WAC 314-55-035(1). Pursuant to the regulation, the "true parties of interest" for a corporation are all corporate officers and stockholders, and their spouses. WAC 314-55-035(1). The regulation also provides that any

- 15 -

entity or person expecting a percentage of the profits from a marijuana licensed business in exchange for a monetary loan or expertise is also a "true party of interest." WAC 314-55-035(1). We have previously explained that a "'true party of interest' is specifically distinguishable from . . . 'persons who exercise control of business.'" Haines-Marchel v. State Liquor & Cannabis Bd., 1 Wn. App. 2d 712, 723-24, 406 P.3d 1199 (2017) (internal quotation marks omitted), review denied, 191 Wn.2d 1001 (2018). The regulation does not require that persons or entities who exercise control of the business be listed in a marijuana business's license, but does state that the WSLCB will investigate those persons or entities. WAC 314-55-035(4).[8]

Podworks' assertion that Headspace, to protect its trademark, must have exercised sufficient control over X-Tracted so as to become a "true party of interest" misapprehends the meaning of "true party of interest". That Headspace might have sufficient control over X-Tracted's production of cannabis concentrates to protect its trademark rights does not establish that Headspace thereby became either a corporate officer or a stockholder of X-Tracted (nor a spouse of corporate officers or stockholders). Similarly, it does not necessitate that Headspace receives a percentage of X-Tracted's profits.[9] Hence,

---

[8] WAC 314-55-035(4) states in full: **"Persons who exercise control of business** – The WSLCB will conduct an investigation of any person or entity who exercises any control over the applicant's business operations. This may include both a financial investigation and/or a criminal history background."

[9] It is possible that Headspace's license agreement with X-Tracted specified that Headspace would receive a percentage of X-Tracted's profits, in which case Headspace would have been a "true party of interest" under the regulation. The exact terms of the license agreement were not alleged in the complaint. However, it is consistent with the allegations of the complaint to hypothesize that the license agreement does not create such an arrangement. Headspace could have the required control to establish trademark rights without being a "true party of interest."

Headspace can have the necessary control over quality of X-Tracted's cannabis concentrates to establish trademark rights without becoming a "true party of interest."

Furthermore, even if Podworks had asserted that Headspace was required to submit to an investigation by the WSLCB as an entity that controlled X-Tracted's business operations, such an assertion is not supported by the language of the regulation. The regulation stated that the WSLCB would conduct investigations of persons or entities that exercised control over business operations. WAC 314-55-035(4). It did not require the licensed business to provide a list of all parties with whom it has licensing agreements or copies of those agreements.

Additionally, the recent enactment of RCW 69.50.395 supports our reading of the regulation. The current version of WAC 314-55-035 came into effect on June 18, 2016, and ESSB 5131, with the pertinent provisions codified at RCW 69.50.395, was signed into law on May 16, 2017. RCW 69.50.395 clarifies that marijuana businesses must disclose to the WSLCB all licensing agreements, and was passed after the enactment of the WAC regulation directing the WSLCB to investigate persons exercising control over a licensed marijuana business. RCW 69.50.395(2). It is plain that the legislature collectively thought that the WSLCB required a clearer statement of its role under I-502's regulatory system, as regards licensing agreements. The legislature determined that requiring the disclosure of licensing agreements to the WSLCB would best implement the policy approved by the voters in I-502. The legislature clarified this for the

- 17 -

WSLCB, explicitly mandating that it require disclosure of licensing agreements in the future.[10]

If, indeed, X-Tracted failed to disclose its licensing agreement with Headspace to the WSLCB, such failure was not unlawful because the WSLCB did not previously require the disclosure of such agreements. Following the enactment of RCW 69.50.395, however, it is clear that the WSLCB must now require X-Tracted to disclose the agreement. Podworks' assertion that Headspace could not have had sufficient control over X-Tracted's production of cannabis concentrates without violating the CSA is unavailing.

Reversed and remanded.

_____ Dwyer, J.

We concur:

_____ Andrus, J.

_____ Appelwick, C.J.

---

[10] The WSLCB, as an executive branch agency, properly confines its rule making to such authority as is delegated to it by the legislature or the people (through initiative). The best view of this aspect of the bill is that the agency was unclear as to its responsibilities vis-à-vis licensing agreements, upon passage of the initiative, and that the legislature properly clarified the issue.